**ROBINSON v. UNITED STATES.**

No. 9754.

Circuit Court of Appeals, Sixth Circuit.

July 31, 1944.

Robert E. Hogan, of Louisville, Ky., for appellant.

Eli H. Brown, III, of Louisville, Ky., for appellee.

Before HICKS, ALLEN, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

On October 20, 1934, a grand jury returned an indictment, containing two counts, against appellant, his wife and father, charging them with kidnapping Mrs. Alice Stoll on October 10, 1934, in violation of Sec. 408a of Title 18 U.S.C.A., and with a conspiracy to kidnap Mrs. Stoll. Sec. 408c Title 18 U.S.C.A. While appellant was at large his codefendants were tried and acquitted on both counts.

Appellant was apprehended by the FBI in Glendale, Calif., on May 11, 1936, waived removal proceedings, was brought by airplane to Louisville, Kentucky, where the alleged kidnaping occurred, and on May 13, 1936, was arraigned in the United States District Court for the Western District of Kentucky on the kidnaping count only, plead guilty and the court sentenced him to imprisonment for life. He was incarcerated in the Federal Penitentiary at Atlanta, was later transferred to the Federal Penitentiary at Leavenworth, and from there he was transferred to the Federal Penitentiary on Alcatraz Island, California.

In 1940, while appellant was serving his sentence in Alcatraz, he applied to the District Court for the Northern District of California for a writ of habeas corpus, which was denied. He appealed to the Circuit Court of Appeals, where the order of the lower court was affirmed. See Robinson v. Johnston, Warden, 9 Cir., 118 F.2d 998. The Supreme Court granted certiorari and remanded the case to the Circuit Court of Appeals for further proceedings. See United States ex rel. Robinson v. Johnston, Warden, 316 U.S. 649, 62 S.Ct. 1301, 86 L.Ed. 1732. Thereupon that court reversed the order of the District Court and remanded the case with directions to issue the writ of habeas corpus and proceed to a hearing upon the merits. Robinson v. Johnston, Warden, 9 Cir., 130 F.2d 202. After a hearing the District Court found that appellant did not intelligently waive counsel when he plead guilty in the District Court for the Western District of Kentucky, and therefore that that court was without jurisdiction, and that the judgment and sentence of life imprisonment were illegal and void. The California District Court followed Johnson v. Zerbst, Warden, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357, and granted the writ of habeas corpus [Robinson v. Johnston, Warden, D.C., 50 F.Supp. 774] but directed that appellant be returned to the Kentucky District Court for further proceedings upon the indictment.

Pursuant to that order, appellant was returned to Louisville, was brought into court, where counsel of his own choosing was appointed for him, and upon his formal arraignment upon the kidnaping count of

the indictment, he plead not guilty. Upon his trial he was convicted and the death penalty imposed. Hence this appeal.

Among the errors assigned, appellant complains that the District Court should have declared Section 408a of Title 18 U.S.C.A. [the Lindbergh Act] to be unconstitutional; that it should have sustained his demurrer to the indictment on the ground that it was too indefinite and uncertain; that appellant was subjected to double jeopardy; that he was denied the benefit of statutory removal proceedings; that there was error in the selection of the jury; that his motion for a directed verdict should have been sustained; that the court erred in admitting certain testimony and exhibits; that it erred in the instructions to the jury and in denying certain requests for instructions; that the court's manner in charging the jury was prejudicial; that he was convicted and sentenced for what he testified of and concerning Mrs. Stoll; that the District Attorney and his Assistant made prejudicial remarks to the jury in argument; that the court erred in refusing to permit Mrs. Ann Woolet to be impeached; and finally, that his motion for a new trial should have been sustained.

■■ We examine first appellant's complaint, made for the first time in the assignments of error, that the order of the California District Court, directing him to be returned to the Kentucky District Court, was in contravention of the provisions of the Removal Statute, Sec. 591 of Title 18 U.S.C.A. The contention fails for two reasons; (1) it comes too late; and (2) it is immaterial. The presence of appellant in the Kentucky District Court gave it complete jurisdiction over his person, regardless of how his presence was secured. See Albrecht v. United States, 273 U.S. 1, 10, 47 S.Ct. 250, 71 L.Ed. 505; Stamphill v. Johnston, 9 Cir., 136 F.2d 291, 292.

Appellant contends that Sec. 408a, Title 18 U.S.C.A., is unconstitutional in that it violates both the Fifth and Sixth Amendments. The Section follows:

"Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, *provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed,* or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine * * *."

■ We have italicized that portion which allegedly contravenes the indicated amendments. The criticism of these provisions is that they are too vague, uncertain and indefinite to form the basis of a valid indictment. The short answer is, that the provisions do not constitute an element or ingredient of the offenses denounced in Sec. 408a. They relate to the punishment and there is nothing in the Constitution which grants the accused the right to be informed of the punishment that may be inflicted upon him by law. The offense is the subject of an indictment, not the punishment. The punishment is the remedy the law provides, and is not, except perhaps in exceptional cases to be set forth in the indictment. See Bishop on Criminal Law, 3rd Ed., Vol. I, Sec. 204.

Appellant filed a demurrer to the indictment which is in most general terms, but since the case involves the death penalty, we regard it our duty to consider in detail the specific criticisms of the indictment as set forth in brief and argument.

■ It is contended that the kidnaping count did not allege, that Mrs. Stoll was not liberated from appellant's custody unharmed. This count not only charged the statutory elements of the offense, to wit, that the defendants named therein kidnaped Mrs. Stoll and transported her in interstate commerce and held her for ransom, but it went further and alleged, that while she was in their custody they did "beat, injure, bruise and harm and aid and abet each other in beating, injuring, bruising and harming the said Mrs. Alice Stoll and did not liberate her unharmed." It is manifest, therefore, that the demurrer, as to this feature, is a "speaking demurrer" and is bad.

■ But appellant goes further and alleges, that the phrase "and did not liberate her unharmed" was too indefinite as a basis for the indictment; that the word "harmed" admits of varying degrees of

meaning from slight to grave, and that appellant was entitled to be advised by the indictment as to what particular injuries the Government would insist had been inflicted upon Mrs. Stoll at or before the time she was liberated. We again point out that the phrase "and did not liberate her unharmed" did not state an essential part of the offense charged. Appellant might have been convicted without any showing that Mrs. Stoll was liberated at all; or, if she was, whether she was set free either sound or unsound, in mind or body. The punishment provided by the statute varied from imprisonment from one year to life, in the discretion of the court, or to a death sentence "if the verdict of the jury should so recommend," and in determining whether it would recommend capital punishment, the jury was entitled to know from the evidence to what extent aggravation was involved. It was for this reason, no doubt, that the phrase "provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed" was incorporated in both the statute and the indictment. It furnishes a basis for proof as to what extent the offense was aggravated. See Seadlund v. United States, 7 Cir., 97 F.2d 742, 748. In the light of the purpose intended, there is no merit in the contention that the language "liberated unharmed" is too indefinite and uncertain. This language carried no ambiguous meaning. If we should assume ambiguity, it is completely negatived by the averments that Mrs. Stoll was beaten, bruised and injured. It follows logically that there is no merit in Assignment #16 that the court erred in admitting the testimony of various witnesses as to Mrs. Stoll's physical condition when she was released.

■ Appellant complains that he has been placed in double jeopardy, in contravention of the Fifth Amendment. This contention cannot be sustained for two reasons: (1) Because, as hereinabove indicated, it has been judicially determined that the original judgment and sentence by the Kentucky District Court were not a judgment and sentence at all; and (2) because the original judgment and sentence having been declared void at his insistence, appellant may not later introduce it as a hindrance to the further administration of justice. Bryant v. United States, 8 Cir., 214 F. 51, 53; King v. United States, 69

App.D.C. 10, 98 F.2d 291, 295. As pointed out in the Bryant case, it is not material that appellant attacked the original judgment and sentence collaterally by habeas corpus instead of directly by appeal.

After the jury was impanelled, but before it was sworn, it appeared that the trial was likely to be protracted and the court ordered that two additional jurors be selected as alternates, under the provisions of Sec. 417a of Title 28 U.S.C.A. By agreement, one juror only, C. E. Miller, was selected as an alternate and was seated adjacent to the jury box. Before the jury and the alternate were sworn, appellant's counsel objected to the alternate but withdrew the objection upon his attention being called to the fact that he had agreed to take no such exception. The jury and the alternate were sworn and the trial proceeded. During its progress, Mrs. Davidson, a juror, became ill and unable to continue. She was discharged and Mr. Miller, the alternate, without objection, took her place in the box. Appellant, in the assignment of errors, for the first time insisted that Miller's participation as a juror was unlawful because the statute, under which he was selected, was an invasion of appellant's constitutional right to trial by a jury of twelve, as provided by the Sixth Amendment, and by Article III, Sec. 2, Cl. 3 of the Constitution.

■ We find no merit in appellant's contention, first, because it appears that he was tried by an impartial jury of twelve. Miller was a competent juror, was unchallenged upon any ground of personal disqualification, sat next to the jury box until he was substituted as a regular juror, and then took his place as such. He saw and heard all the proceedings of the trial and was segregated with the other jurors, and there is nothing to indicate that his participation in the deliberations of the jury was prejudicial. He obeyed the orders and admonitions of the court, just as did the other jurors. This is the first attack upon the constitutionality of the Act in question and we find no reason to think that it is unconstitutional. It is a forward looking statute and a needed reform in procedure. A similar statute has been upheld by the Supreme Court of North Carolina in State v. Dalton, 206 N.C. 507, 174 S.E. 422.

■ Second, appellant undoubtedly waived his right to trial by the jury originally impanelled and consented to the sub-

stitution of the alternate and there is no constitutional inhibition against such waiver. In Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 254, 74 L.Ed. 854, 70 A.L.R. 263, the question certified was as follows:

"The court below * * *, being in doubt as to the law applicable to the situation thus presented, and desiring the instruction of this court, has certified the following question:

"After the commencement of a trial in a federal court before a jury of twelve men upon an indictment charging a crime, punishment for which may involve a penitentiary sentence, if one juror becomes incapacitated and unable to further proceed with his work as a juror, can defendant or defendants and the government through its official representative in charge of the case consent to the trial proceeding to a finality with eleven jurors, and can defendant or defendants thus waive the right to a trial and verdict by a constitutional jury of twelve men?"

This question was answered in the affirmative. If a defendant can validly consent to a trial by eleven jurors, when the twelfth becomes incapacitated, we can perceive no valid objection, if he should consent to a trial by twelve jurors, one of whom was an alternate impanelled in accordance with the statute. See also Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435.

■ Appellant claims that the court erroneously denied him the right to challenge for cause the following proposed jurors, to wit, Allen, Ballard, Sutcliff, Van Cleave and Eastes, and that he was compelled to use five of his statutory challenges upon these jurors. It was the duty of the court [Title 28, Sec. 424, U.S.C.A.] to determine appellant's right to challenge for cause. Our duty is limited to the question whether there was manifest error in denying the challenges. Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244. We cannot within reasonable limits review the evidence upon these questions. In the case of juror Allen, it related to his business connections with the Government. In the case of the other four, it touched upon reported relationships to and contacts with Mrs. Stoll and her family.

We conclude that there was no abuse of judicial discretion in denying the challenges. It is not manifest, as a matter of law, that they should have been sustained. Moreover, we do not think that their denial resulted prejudicially for the jury selected was so far as we can determine, fair and impartial. See Simpson v. United States, 8 Cir., 184 F. 817 and cases there cited.

Appellant challenges the denial of his motion for a directed verdict. Under his plea of not guilty he relied upon the defense that he was insane prior to, at the time and subsequent to, the alleged offense. There is therefore involved, not only the question whether there was substantial evidence that he kidnaped Mrs. Stoll, transported her in interstate commerce and held her for ransom, but, if so, also the question, whether he was mentally responsible for his acts.

■ At the trial appellant expressly waived any contention "that he is now insane." That he was not then insane is borne out by the report of a committee of four psychiatrists, who examined appellant by direction of the court. This report, dated October 11, 1943, concluded, "The diagnosis in this case is, 'without psychosis.' This term is used by psychiatrists to signify that an individual is not insane and that he does not suffer from any form of mental disorder which would render him incompetent and irresponsible."

Appellant was born in 1907 of indulgent and well-to-do parents at Nashville, Tenn., and was reared and educated there. He had the usual run of children's diseases, plus an aggravated attack of malaria when he was fourteen. This was followed by tuberculosis for which he was hospitalized at the age of fifteen for approximately a year. Following his release his mother gave him a Buick coupe. He went to the Ross and Wallace Schools and then to Vanderbilt Law School, where he studied for two and a half years, making excellent grades and lacking only two or three subjects of completing the course. While at Vanderbilt he moved in good society, was a member of two fraternities, and participated actively in school functions.

He testified that when he was twenty years old, he was forced to marry a "casual pick-up," with whom he had been sexually intimate over a period of less than seven months, and that shortly after the marriage she gave birth to a nine months' baby. Some time later he obtained a divorce on the ground that the marriage had been procured by fraud, but he testified that the

incidental embarrassment and scandal disturbed him; that he withdrew into himself, severed his social contacts and eventually quit the law school.

Appellant testified that after leaving Vanderbilt he worked four of five months for a lumber company and was discharged for neglect of duty. He married a second time, January 9, 1929, and a child was born on August 31st of the same year. In March 1929 he entered two homes in Nashville on the pretense of being a deputy sheriff and stole jewelry worth several thousand dollars, and in one instance, drove away in the owner's car. He borrowed money on these jewels at a Nashville bank. In May 1929 he was indicted for these offenses. He plead "present insanity" and upon a finding by a jury that he was insane at that time, he was committed to the Central State Hospital for the Insane where he remained about a year. The indictments were dismissed in May 1930, but appellant's father brought lunacy proceedings against him in the County Court of Davidson County, where upon a finding by a jury that appellant was of unsound mind, he was again committed to the Central State Hospital and afterwards transferred to the Western State Hospital at Bolivar, where he could get more fresh air, sunshine and exercise, and he remained there until August 1930, when his father, who had been appointed his Guardian, insisted upon removing him, and assumed full responsibility for his welfare.

Dr. Cocke, Medical Superintendent at the Western Hospital, testified that the Examiners at the Central Hospital diagnosed appellant's case as dementia praecox, but that his own staff diagnosed him as a psychiatric personality, which meant that he was not insane but incapable of meeting the demands of his environment. Dr. Cocke testified that since appellant was not insane, he could not legally hold him in the hospital, although he was of the opinion that it was best for him to stay there; that he was dissatisfied, would not come under discipline, and was difficult to control; that he would violate regulations, was unstable and incapable of going out into the world and assuming the responsibilities of life. In a letter to the State Commissioner of Institutions on September 4, 1930, Dr. Cocke wrote of appellant: "He knows right from wrong as any normal person would but he is just one of those types that cannot resist the temptation of doing wrong and committing crimes. I insisted on Mr. Robinson keeping the boy here but he thought otherwise. It seems that they" (referring to the parents) "won't stand for the boy to be disciplined and without discipline or institutionalization the boy will never make the grade."

Following his release, appellant and his family spent some time at his parents' home, where it is in evidence that he struck his mother, threatened to kill his father, and showed great jealousy of his wife. He found the stigma of insanity worse than the disgrace of a forced marriage. He testified that he quit going to church because he felt the preachers were preaching directly at him; that in the hospital he felt the doctors were against him; that he felt he was the reincarnation of Patrick Henry and should have a high place in national affairs. He had difficulty in getting a job. He worked for the Servel Company for one day in May 1931, and left because he was dissatisfied. Through family connections he got a job at a filling station with the Stoll Oil Company in Louisville, and held it from June 1, to July 10, 1931, when he quit to become a collector for an insurance company for two months. For almost two months in 1932, he solicited for a business school in Nashville and then went to Winnetka, Ill., for a few months to sell oil burners. From January to April, 1933, he was maintenance man at an apartment in South Bend, Ind. In 1934, he was employed at the DuPont plant in Nashville and was temporarily discharged in May because in his application for bond he failed to disclose his insanity record.

Appellant testified that shortly thereafter he left Nashville when he was faced by two girls with what he called false charges of robbery at a night club. He denied that he told the Attorney General that if those girls testified against him he would "smear them all over the papers of Nashville." However, on cross-examination the Attorney General, a witness for appellant, testified that appellant said he was not fearful of prosecution because he would testify that they had sexual relationship with him and he would ruin their reputation.

Appellant claims that in 1934 he again sought employment from C. C. Stoll, or the Stoll Oil Company, in Louisville, but was told that it was the policy of the Company not to rehire persons who had quit. He claims that he got the idea, when he was trying to get employment in Chicago, that

Mr. Stoll was giving him a bad reputation and was preventing him from getting a job. He claims to have brooded over this and felt that Mr. Stoll was a powerful capitalist and a menace to the country and responsible for the depression.

However, appellant did obtain employment as night janitor in a building in Oak Park, Chicago, from June to August 18th. This was his last job. Upon leaving there he and his wife moved to Magnolia Avenue in Chicago and took up life under an assumed name. Four weeks later he rented a car from the Saunders U-Driv-It Company to move to the south side of Chicago but instead of stopping there he and his wife drove to Indianapolis and in the first week of September he rented an apartment under the name of Thomas W. Kennedy at 2735 North Meridian Street, which was used as the hide-out for the alleged kidnaping which followed.

This, then, is the confused and desultory pattern of appellant's life prior to the offense with which he is charged.

Appellant claims that while in Indianapolis he tried to secure employment and that his failure to do so accentuated his feeling toward C. C. Stoll and that he prepared a ransom note with the idea of kidnaping him. He purchased a pistol and early in October, still using the U-Driv-It car, he and his wife drove to Louisville, where on October 8th, he registered at the Tyler Hotel. His wife went on to Nashville by train. On October 9th he gained entry to the home of C. C. Stoll on a pretense of being a telephone repairman and not finding him in, went to the home of George Stoll and entered it under the same guise. George Stoll was not there and appellant gave up the quest and went back to the hotel.

On the next afternoon, appellant went to the Berry Stoll home with the purpose in mind of kidnaping Berry Stoll, the husband of Mrs. Alice Stoll, and the son of C. C. Stoll. He entered the home by the same ruse and questioned Mrs. Ann Woolet, the maid, about the members of the household. He thus discovered that there was no chauffeur and that a colored workman had left. Mrs. Woolet testified that he went to the garage and seemingly checked the wires there, then asked about the extension on the second floor and asked the maid to come to that floor to help him check it. His actions were not suspicious since the Stolls had been having trouble with their telephone. Mrs. Stoll nursing a cold, was dressed but wearing a kimono, and was in her bedroom where the phone was located. When Mrs. Woolet advised her that the repairman wanted to check it, she moved to the guest room. The maid testified that soon after she entered the bedroom where appellant was, he dropped his screw driver, put a gun to her back and told her to go to the room where Mrs. Stoll was.

There is a sharp conflict in the evidence as to what happened in the guest room. Appellant testified that he had become acquainted with Mrs. Stoll in 1931 when he worked at the Stoll filling station, because she frequently parked her car there; that a flirtation ensued and that on four different occasions they engaged in sexual intercourse, once on a secluded lane leading to the Rose Island Ferry, twice at the Beech Grove Tourist Camp on the Dixie Highway, where they registered as man and wife, and once in Indiana, on the outskirts of Jeffersonville, near the Log Cabin roadhouse, where they registered as man and wife and took one of the cottages in the rear. The record reveals that appellant and Mrs. Stoll could not have registered at the Beech Grove Tourist Camp at the times testified to by appellant for the compelling reason that it did not then exist as a tourist camp.

He testified that when he went into the guest room Mrs. Stoll smiled and said, "What are you doing here?" and that he replied, "I have come to kidnap Berry Stoll." His testimony is that they talked for an hour and that she told him he could not get away with it; that she offered him a check, which he refused; that she was afraid for her husband to find him in the house and suggested that she go herself and that she would help him get the money if he would give her half of it. He denied that he threatened either Mrs. Stoll or Mrs. Woolet, with a pistol, but testified that he had left the pistol in the glove compartment of the car. He testified that he had tied Mrs. Stoll's hands loosely with wire but that when she decided to go, she took the wire off her wrists and got her coat; that they went down the stairs together and that she got in the back of the car and kneeled down because she was afraid that they would meet her husband on the road.

Mrs. Stoll, who from the witness stand identified appellant as the kidnaper, testified that when the maid opened the door to the

guest room appellant followed, holding a gun at her back. She said, "What are you doing in here?" and he replied that he had come to kidnap her. She testified that she tried to dissuade him by telling him that her father, Wm. Speed, had had bank losses and was not wealthy, but that her arguments were of no avail. She testified that when appellant laid his gun on the bed for a minute, intending to tie her hands, she made a grab for it and that he hit her on the forehead with an iron pipe, causing a fracture. She continued to resist and made a move to go to her bedroom for a gun and he hit her again over the right ear so hard that she fell over on the bed, dazed and bleeding.

Mrs. Stoll testified that while he held the gun on both of them, he ordered the maid to bind her (Mrs. Stoll's) wrists with wire. The maid was then bound hand and foot with wire and Mrs. Stoll testified that before leaving the guest room appellant put adhesive tape over her mouth so that she couldn't open it; that she was allowed to get her coat and was ordered to the car, appellant walking behind her with the gun. Her testimony was that when she got to the car she was ordered to lie down on the floor in front of the back seat; that her feet were bound and she was covered with a blanket and newspapers. She further testified that after appellant threatened to kill her husband if he arrived while appellant was still there, she didn't resist any further and became anxious to get away before he came home.

Mrs. Woolet's direct testimony as to what took place in the guest room was substantially similar to that of Mrs. Stoll. She added that the pipe with which appellant struck Mrs. Stoll was wrapped in paper and the pipe itself was introduced as a physical exhibit. She testified that appellant had brought the wire and the adhesive tape with him, and after she had unbound her ankles, she went to the telephone and found that it had been disconnected.

On cross-examination Mrs. Stoll denied emphatically that she had known appellant when he was employed at the Stoll filling station; that he had ever serviced her car, or that she had ever seen or talked to him before the day of the kidnaping.

It thus appears that the testimony of appellant on the one hand and of Mrs. Stoll and Mrs. Woolet on the other is contradictory, but contradictory evidence is not to be considered in determining the motion for a directed verdict. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Rochford v. Pennsylvania Co., 6 Cir., 174 F. 81, 83; Minneapolis, etc., Ry. Co. v. Jos. Galvin, 6 Cir., 54 F.2d 202.

Several witnesses testified as to conditions in the room after the alleged abduction. There were blood stains on the pink coverlet of the bed, one the size of a large plate and the other as large as an ordinary saucer, and there were splotches of blood around the edges of the stains.

As to the ransom note: Mrs. Stoll testified that appellant did not display any ransom note in her presence nor any envelope in which it might be contained. Mrs. Woolet testified that when appellant left the guest room with Mrs. Stoll "he threw the ransom note on the bed and said 'you give this to Berry Stoll,'" but that she never touched it.

Berry Stoll testified that when he reached home, apparently about fifteen minutes after appellant and Mrs. Stoll had left, he ran in, saw the condition of the room, the large splotches of blood on the bed, the ransom note and a pipe wrapped in paper on the floor. Appellant's own testimony touching the ransom note was that while he was still in Indianapolis he had prepared a ransom note with the idea of abducting C. C. Stoll and that the note was made out in the name of C. C. Stoll; that when Mrs. Stoll suggested that he take her rather than her husband, and divide the ransom money, he told her the note was made out for only $30,000 and that if she were to get half he would have to raise the amount on the ransom note; that he took the note out of his pocket and changed the amount from $30,000 to $50,000 in pencil and marked across it in pencil, "For Mrs. Stoll." He said that when he went over to tie the maid's feet the note fell out of his pocket.

Appellant's description of the changes on the ransom note fits like a glove the ransom note that was recovered in the Berry Stoll house. The note was typewritten and was made out in C. C. Stoll's name, with ransom fixed at $30,000. On the envelope in very crude lettering in pencil appeared the notation "$50,000 for Mrs. Stoll," and to the typed designation, "To the Members of the Stoll Family" was added, "and Mr. Speed." Mr. Speed was Mrs. Stoll's father. At the top of the first sheet of the ransom note was crudely added by pen, "Intended for C. C. Stoll at first"

and Mr. Speed's name was added in pencil to the salutation. On the second page at the top was added crudely in ink "Same for Mrs. Stoll except amount" and the designation "$30,000 (thirty thousand dollars)" was stricken and the figures and words "$50,000 (fifty)" written above. The typed part of the note indicated that Mr. Stoll was to fill in blanks designating an intermediary in Nashville, Tenn. However, the instruction "(to be filled in by Mr. Stoll)" was scratched and the blank filled in in ink with the name of "T. H. Robinson 1716 Ashwood Ave." On account of its length we do not reproduce this ransom note. It is enough to say that it discloses a scheme, thorough in conception, and that the writer was "fully aware" of the Lindbergh Act.

Mrs. Stoll testified that after leaving the house they must have driven for two and a half hours or more, when appellant told her they were in Indianapolis; that he stopped at a dark garage, locked her in the car and told her that he was going to see if the coast was clear and that if she made any attempt to scream or attract attention, he would "bump her off;" that she remained bound and gagged in the locked car; that appellant reported that the coast was not clear; that they drove to a deserted part of town, where appellant unbound her and ordered her to sit with him in the front seat; that he then untaped her mouth and she requested him to unbind her wrists, which were giving her a great deal of pain; that her head was still bleeding and that as soon as her mouth was untaped she asked him why he had kidnaped her and he replied, "For the money."

Appellant on the other hand testified that soon after they had passed Berry Stoll's car, which they had met while they were still in or near Louisville, Mrs. Stoll got out of the car and sat on the front seat with him, and that she was not bound or gagged but was free to talk and did talk. Appellant and Mrs. Stoll both testified that when they left the car she walked into the apartment (heretofore described as located at 2735 North Meridian Street.) Mrs. Stoll testified that they entered by the kitchen, which was dark; that she cooked some eggs, which they ate, and that she immediately became nauseated; that her head pained her and she was very weak and ill; that at her request appellant put mercurochrome on her head; that he refused to permit her to sleep on the divan in the living room; that the bedroom had twin beds

and when they retired appellant bound her hands to the springs on either side so that she could not shift her position; that he slept in the other bed and tied a cord from her wrist to his so that if she moved he would know. She was not molested. She testified that the shades were down the whole time she was in the apartment, which was all of five days and parts of two others; that when he left the apartment to buy food, make telephone calls or for any other reason, he would put a chair in a closet, tie her to the chair, gag her, put adhesive over her lips and lock the door, that she was left in the closet several times a day and was never left in the room alone; that when she went to the bathroom she was permitted to close the door but not to lock it, and that he sat in the living room opposite the bathroom door with a pistol in his hand.

Appellant admitted that they were in the apartment for seven days and testified that during the first few days they ate, drank beer, listened to the radio, read newspapers and had discussions; that when he went out she was never bound or gagged until the last two days; that for the first three or four days she didn't appear anxious to get away, that she was calm and took it easy, "took it as a big joke," but that about the fifth or sixth day, possibly because of the publicity the case was getting and the news flashes on the radio, she realized the seriousness of the situation and threatened to walk out.

Mrs. Stoll testified that appellant got impatient at the delay in obtaining the ransom and said that her family was double-crossing him and that she wrote three letters at his direction over the weekend. Appellant denied that he ordered her to write these letters, which were in Mrs. Stoll's handwriting. One, written on Saturday, bore the salutation, "Dear Mr. Intermediary" and enclosed Mrs. Stoll's wedding ring and was apparently sent to verify change in plans, since it accompanied a typewritten letter concluding "Kidnaper" and addressed to Robinson, Sr., the intermediary named in the ransom note, telling him to pay over the money to his daughter-in-law (appellant's wife) who would receive her instructions secretly.

A second letter, written on Sunday, was to Miss McHenry, who was addressed by a nickname known to both. It confirmed a phone call that appellant had made to her and stated that the daughter-in-law was to deliver the money. It warned that police

must be called off or the kidnaper would carry out his threat.

The third letter, written to Berry Stoll on Sunday, stated that she was unharmed except for a small cut and called attention to the change in the person designated to deliver the money and that she must not be followed or interfered with and that it was the last chance for Mrs. Stoll to be delivered alive.

Appellant apparently kept in touch with the intermediary by telephone. Mrs. Stoll testified that he told her that he had made phone calls to the intermediary and to his wife. Miss McHenry received a phone call.

Meanwhile, the Stoll and Speed families got $50,000.00 together in five, ten and twenty dollar bills. The serial numbers were recorded and the money sent by express under FBI guard to Nashville, where Thomas H. Robinson, Sr., the designated intermediary, lived. The package was delivered to Robinson, Sr., in the office of a Nashville attorney on Monday, October 15th, about 12:30 P.M. The money was delivered to appellant next morning. Mrs. Stoll testified that on Tuesday, October 16th, while she was still tied in bed, she heard a knock at the door and called appellant's attention to it. He opened the door and his wife, Frances Robinson, entered, carrying a bundle with the ransom money in it, which she threw on the bed. Mrs. Stoll testified that Mrs. Robinson urged appellant to hurry and get away as the police were following her; that he urged her to go with him but she declined to go.

Mrs. Stoll testified that she was again tied and locked in the closet; that appellant went out and returned in about half an hour and again urged his wife to go with him; that he again left about 11:00 A.M. and soon thereafter Mrs. Robinson untied her and they ate; that at 2:00 P.M. they left the apartment together, walked a block and took a taxi to the home of a Rev. Clegg, whom Mrs. Stoll learned by radio was her husband's cousin; that while there she notified Miss McHenry by phone that she had been released; that the Cleggs started to drive her to Louisville but that the car was overtaken near Jeffersonville by Department of Justice Agents, who took her home.

There is no evidence except that of appellant, that Mrs. Stoll received half or any part of the ransom money. There is substantial testimony, including that of Mrs. Stoll, to the contrary. It appears that Mrs. Stoll's family had provided Mrs. Robinson some money for travelling expenses and that this amount, $470, was returned by the Robinsons through Mrs. Stoll to her husband, Berry Stoll.

We do not undertake to trace appellant's movements after the release of Mrs. Stoll until his arrest, except in a most general way. He admitted that he crossed the continent two or three times; that he stayed at the Waldorf Astoria, the Ritz Carlton, the St. George and the New Yorker, hotels in New York; and the Ambassador and the Biltmore in Los Angeles. He spent and gave away money lavishly, some of it to his mother, who visited him in St. Louis, some to his father, some for the expenses of a travelling companion, some for automobiles, etc., etc. To use his own expression, "Oh, I don't know—that money I threw it away right and left." Something like $5000 was taken from his person when he was arrested.

In addition to the testimony hereinabove disclosed, bearing on the issue of insanity, a mass of expert psychiatric testimony was introduced by both sides.

Dr. Bracken testified that he didn't think appellant had any control over his will. Dr. Solomon was of the opinion that he had no ability to distinguish right from wrong or to resist his impulses. Dr. Crice was of the opinion that appellant was suffering from an insane delusion which had destroyed his ability to distinguish right from wrong.

On the other hand, Dr. Singleton, who was psychiatrist at the penitentiary at Leavenworth, testified that appellant was capable of distinguishing between right and wrong and realized fully the consequences of any deliberate act. Dr. Richey, Chief Medical Officer at the Alcatraz penitentiary, testified to the same effect, on the basis of records of physical and mental examinations made of appellant there, at Atlanta and Leavenworth.

In response to a hypothetical question, Doctors Gardner, Kimbell, Landis and Ackerly, all eminent psychiatrists, stated that appellant was capable of distinguishing between right and wrong and realized the consequences of his own deliberate acts. Even appellant himself in the letter to Bates, written in 1936 and hereinafter referred to, said of himself, "For your in-

formation, I would like to state this, that I am not a mental case, I have no psychosis, and that former decree of insanity was the result of my father imposing on his friendships. * * *"

■ After a careful review of the entire record, we conclude that there was substantial evidence to support the verdict of the jury, and that the motion for peremptory instructions was properly denied.

■ Appellant urgently insists that the jury's recommendation of the death penalty was unjustified because there was no evidence that Mrs. Stoll was not liberated unharmed, or to state it more clearly, because there was no evidence that she was liberated harmed. The proposition has little or no weight.

We have already viewed the testimony of Mrs. Stoll and Mrs. Woolet upon this matter and have noted the testimony of several witnesses that there were two large blood stains on the coverlet of the bed in the room where Mrs. Stoll was seized. Mrs. Woolet testified that when Mrs. Stoll "made a grab for the gun" appellant struck her over the head with "a lead pipe. I suppose it was lead, it was a heavy pipe anyway. It was a pipe wrapped in paper." He then "hit her over the head again with that pipe and then she fell back on the bed. He hurt her pretty badly—I thought she was unconscious for a bit * * * it brought blood."

Berry Stoll testified that when his wife was returned, "She was in a horrible shape, her lips were drawn and bleeding from where the adhesive tape had been, and raw. There was horrible blood all over her forehead. Her head was covered with blood and she was completely unnerved and completely shattered."

Mrs. Douglas Potter (Miss McHenry) who saw Mrs. Stoll either the first or second day after her return, testified: "She was in a highly nervous state, she had a bump on her forehead * * * and she had a cut in her hair, and she was very nervous, couldn't keep her mind on anything, was walking up and down, was very sensitive to any voice or any one coming up the driveway. * * * Her mouth, the skin was all raw around the outside of her mouth, and also on her wrists, her skin was raw."

Dr. Frazier, who attended Mrs. Stoll about 9:00 P.M. on the day of her release, testified that she "was utterly worn out, she was pale, bedraggled, had circles under her eyes, she had sores on her lips with some remnant of the dirt adhesive plaster will leave at its margins * * * though outwardly calm, she was under terrific nervous tension * * * she had a rounded swelling on her right temple which was an inch and a half in diameter. It began under her hair line and covered pretty much the entire temple. This place was not discolored as the usual bruise is, but was quite tender to touch and quite hard, and I felt that it represented bleeding under the skin that covers the bone, the periosteum, and the mere fact that it did not discolor and was so long absorbing, going down, made me believe that perhaps there the actual integrity of the bone had been interrupted. The other injury was on the back of her head a little above and behind the ear, and that was covered up by a clot of blood which had matted the hair also * * * it was the sort of cut that should have had at least two stitches taken in it * * * but fortunately the wound had not gaped and healing was in process." He saw her on the following day and testified that her blood pressure had gone down but that she was completely exhausted. The lump on her head "had not been entirely absorbed at the end of the week, but it had diminished in size by more than half and was less tender. * * *"

The evidence that appellant seriously injured Mrs. Stoll at the time of her abduction and that she was suffering from these injuries at the time of her release was not only relevant, but was precise, substantial and highly cumulative.

■ It is argued that the jury would not have recommended the death penalty if appellant had not, in support of his contention that Mrs. Stoll went with him willingly, testified that he had had sexual relations with her. The difficulty with this contention is that it has no evidence to support it. It arises out of a statement by the court in imposing the sentence. The court said: "It seems to me that this jury would never have recommended the death penalty in this case except for the effect which they gave to the defense that the defendant made representing the relations between him and Mrs. Stoll. I believed if that contention had not been made, this jury would never have recommended the death penalty." But this comment of the court, standing alone, is not sufficient to set aside the verdict. Had the jurors them-

selves advanced the same reason for the imposition of the death penalty as did the Judge, they would not have been heard thus to impeach their verdict. Hyde v. United States, 225 U.S. 347, 384, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; McDonald v. Pless, 238 U.S. 264, 267, 35 S. Ct. 783, 59 L.Ed. 1300.

Error is alleged upon the admission of evidence tending to show the commission of prior offenses by appellant. We do not discuss this matter in detail. This type of evidence, which to some extent was adduced by appellant himself, centered around the issue of insanity. It was relevant for whatever it was worth to the jury in assisting it to determine that issue and the court limited it to that purpose. There was no prejudicial error in its admission. See Arwood v. United States, 6 Cir., 134 F 2d 1007, 1012.

Appellant contends that the court erroneously declined to permit him to impeach the witness Mrs. Woolet by showing that she had executed a contradictory affidavit and by showing further by witnesses Powell, Joseph Hayse and Nellie Hayse that she had made contradictory statements out of court concerning matters about which she testified.

First, as to Powell: It was not error to sustain the objection to his testimony because appellant wholly failed to observe the general rule, that to contradict the witness by evidence of what she had said out of court to other persons on the same subject contradictory to what she afterwards testified in court, it is essential that she should first be asked whether she made such statements at a fixed time and place, to certain persons, and that the words used or their substance be stated to her to refresh her memory and to enable her to reply intelligently.

Second, as to Joseph and Nellie Hayse: Appellant sought to prove by these witnesses that Mrs. Woolet had previously made statements and executed an affidavit that contradicted her testimony. The question arose as to whether the testimony of these witnesses would disclose confidential communications between attorney and client. This is a question to be determined always by the judge. People's Bank v. Brown, 3 Cir., 112 F. 652, 654. The Judge heard the matter out of hearing of the jury and declined to admit the offered evidence. Without going into great detail, we find a preponderance of that evidence to be that the witness, Mrs. Woolet and her husband, Fowler Woolet, after the alleged kidnaping, conceived the idea that they might have a cause of action against the Stolls and Mrs. Speed, the mother of Mrs. Stoll, for some character of mistreatment, real or imaginary, in connection with the event; that Fowler Woolet consulted Joseph Hayse, the witness, who was a lawyer, and later brought his wife to Hayse's office; that they consulted Hayse with reference to their claim and that in that connection Mrs. Woolet made a detailed statement of facts connected with the alleged kidnaping; that later this statement was in substance repeated to him at his home and reduced to writing by a notary public (who assisted Hayse and subsequently married him), and was signed and sworn to by Mrs. Woolet. The Woolets claimed that these statements and the affidavit were confidential and we do not think error was committed in their exclusion. No citation of authority is needed to support the familiar and long established rule of law that an attorney cannot disclose communications made to him by his client without the client's consent, and Mrs. Woolet has not consented. It is beside the point that Joseph Hayse did not receive a fee or accept a retainer. Moreover, we have examined the affidavit in question and find little therein that would tend to contradict the testimony of Mrs. Woolet upon any material matter.

Appellant asserts that the court erroneously overruled his motion to strike the testimony of Government witnesses Smith and Knowles and the exhibits to which their testimony referred. Smith took fingerprints of appellant following his arrest. These fingerprints were introduced in evidence. Knowles, having more than seventeen years' experience in connection with fingerprinting, compared the fingerprints of appellant with those on the ransom note and its envelope and a large number of exhibits which purported to reveal appellant's fingerprints, and testified that the fingerprints upon the exhibits could have been made by no other person "than Thomas H. Robinson or by any other finger than his right thumb." Appellant's claim is that the name "Thomas H. Robinson" used by Knowles referred to his father, Thomas H. Robinson, Sr., and not to him, Thomas H. Robinson, Jr. The point has no weight. Appellant's father, Thomas H. Robinson, Sr., was not on trial. He had

long since been acquitted, and was dead. An examination of the entire testimony of Knowles clearly indicates that he used the names "Thomas H. Robinson" and "Thomas H. Robinson, Jr.," interchangeably as referring to appellant. We have no doubt that both the court and jury so understood.

 Charles A. Appel, a handwriting and questioned documents' expert, was a witness for the Government. The Government proposed, by the introduction of his testimony, to establish the genuineness of appellant's handwriting upon the ransom note and other documents by comparison with known specimens of his handwriting. The objection to Appel's testimony was that appellant had not been given notice before trial of the Government's intention to examine this expert. Appellant relies upon Sec. 422.120, Kentucky Revised Statutes (Ky.Stat. Sec. 1649) which requires such notice, but appellant's obstacle is that federal courts are not bound in criminal cases by state practice or statutes. United States v. Murdock, 284 U.S. 141, 150, 52 S.Ct. 63, 76 L.Ed. 210, 82 A.L.R. 1376; Cagle v. United States, 6 Cir., 3 F.2d 746. Appellant's citation of Erie Railroad v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, is not in point. It has not been decided that the holding in Erie R. R. Co. v. Tompkins is applicable in a criminal case. Moreover, that case affects rules of decision and not of practice.

 Error is assigned upon the admission of two letters written by appellant, one to W. A. Smith of the FBI, dated July 1, 1936, and the other to Sanford Bates, Director of the Federal Bureau of Prisons, dated January 1, 1936. These letters were written while appellant was an inmate of the Federal Penitentiary at Leavenworth, undergoing the sentence imposed upon him on his original plea of guilty. A portion of the Smith letter was introduced for the purpose of having appellant's handwriting in the record and was competent therefor in view of the Government's contention that appellant wrote the ransom note and other documents. Finally, the whole letter was read to the jury, without objection, and appellant admitted that he voluntarily wrote it. The Bates letter was admitted as relevant to the issue of insanity under the plea of not guilty. We do not set out the contents of this letter but content ourselves with saying that it was competent for what it was worth to

the jury in determining the question of appellant's sanity or insanity at the time of the occurrence of his alleged offense. The point attempted to be made is that these letters were in the nature of involuntary confessions of guilt and therefore inadmissible for any purpose. This contention is unsound. The letters were written without the slightest duress or constraint, were wholly voluntary, and we find no reversible error in their admission.

Appellant complains of certain excerpts taken from the opening argument to the jury of the Assistant District Attorney and from the closing argument of the District Attorney. These excerpts are found at pages 130-133 of the record. We regard it as unnecessary to reproduce them. They were unexcepted to.

 The general rule is that counsel for the defense cannot remain silent and after verdict seize for the first time on the point that the comments to the jury were improper and prejudicial. See Crumpton v. United States, 138 U.S. 361, 364, 11 S. Ct. 355, 34 L.Ed. 958, a case involving the death penalty; and United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129. That portion of the argument of the Assistant District Attorney was, in substance, nothing more than an explanation to the jury of the effect of their verdict in case it did, or did not, make a recommendation. This was not prejudicial.

 In the closing moments of his argument the District Attorney stated, "I think the hardest thing I have ever done in my life, and a day that I will always remember, was when I explained to Mrs. Stoll" that she could probably expect that appellant would give testimony that would reflect upon her character for virtue. He went on to state to the jury the difficulty he had had within the time limited to procure and produce evidence to refute this particular testimony of appellant. These statements, strictly speaking, overstepped the bounds. We have examined them in connection with the entire argument and we regard them as isolated expressions, which could have no prejudicial effect. In Dunlop v. United States, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799, it was said: "If every remark made by counsel outside of the testimony were ground for reversal, comparatively few verdicts would stand, since, in the ardor of advocacy, and in the excitement of trial, even the most experienced

counsel are occasionally carried away by this temptation." See Stephan v. United States, 6 Cir., 133 F.2d 87, 98.

It is urged that the court erred in certain instructions to the jury and in refusing to give certain requested instructions. The requests were presented before the charge was delivered. At its close the court asked, "Any further requests by counsel for either side?" to which counsel for each side replied, "Nothing further, Your Honor."

No exceptions were taken to the charge and under well recognized procedure it is not reviewable. Chapman & Dewey Lbr. Co. v. Hanks, 6 Cir., 106 F.2d 482, 485; Illinois Cent. R. R. Co. v. Sigler, 6 Cir., 122 F.2d 279, 284. But the case involves the death penalty and we have therefore examined the charge and the requests. Stephan v. United States, supra. The substance of these requests was that the court instruct the jury that it could not recommend the death penalty if Mrs. Stoll were released unharmed before imposition of sentence, and further, that it could not recommend the death penalty because there was no evidence upon the question whether at the time of the trial she was either injured or uninjured. These requests were not only inapplicable but were not the law. The Act refers to the condition of the kidnaped person at the time of his or her release [United States v. Parker, 3 Cir., 103 F.2d 857, 861] and not at the time of trial or the imposition of sentence. The court carefully, and we think, correctly, followed the law as interpreted in the Parker case.

A general criticism of the charge is that it made unfair comment upon the testimony of some of appellant's witnesses and that in delivering it the court's manner of speech, tone of voice and articulation were prejudicial. We have examined these criticisms and conclude that the charge was fair and impartial.

It is said that the court erred in overruling appellant's motion for a new trial. The court's action upon the motion for a new trial is not reviewable further than to determine whether it went beyond the limits of judicial discretion. The record indicates no such abuse of judicial authority.

After having carefully examined this unusually large record, we conclude that it presents no prejudicial error, and the judgment appealed from is therefore affirmed.