## UNITED STATES v. PARRINO.

No. 176, Docket 21588.

United States Court of Appeals
Second Circuit.

Argued Feb. 3, 1950.

Decided March 7, 1950.

614

Harold Turk, Brooklyn, N. Y., Harry K. Nadell, Brooklyn, N. Y., for appellant.

· Frederick H. Block, New York City (Irving H. Saypol, United States Attorney, New York City, Bruno Schachner, Daniel H. Greenberg, New York City, Assistant United States Attorneys, of counsel), for appellee.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

Parrino appeals from his conviction upon an indictment in two counts: one, for kidnapping, and the other, for conspiring to kidnap.[1]  Only one question is involved: whether the prosecution was already barred by the Statute of Limitations, when the indictment was found in October, 1948. The facts, so far as relevant, are as follows. Parrino had been indicted in September, 1934, for a conspiracy to kidnap one, Ro-

zen; but he had "fled from justice" within the meaning of the Criminal Code,[2] and remained in hiding until at least February, 1940. On November 19, 1937, Judge Knox entered a *nolle prosequi* on the first indictment at the request of the district attorney, and upon his return Parrino began to live an innocent life in Brooklyn. He obtained a social security card; registered as an alien with the Department of Justice; opened a savings bank account, and a drawing account in a bank of discount; registered under the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 301 et seq.; registered a commercial truck and a passenger car, and · renewed their licenses; started a grocery business, and took out insurance on his stock of goods; procured a marriage license and was married in church; took out ration books; filed income tax returns and employer's information returns; and filed a petition for naturalization, supported by a certificate of good conduct from the police. All these activities went on under his own name and without concealment until the autumn of 1948, when he was discovered by the Federal Bureau of Investigation and arrested. Rozen, the man kidnapped, had been released soon after the first indictment was found; but the only information in the present record about his condition at the time of his release is that a jury might have found that he was released harmed within the meaning of the statute.[3]  In charging the jury the judge said that, if they found that the kidnapped person had not been "liberated unharmed," they were to declare whether they recommended the death penalty. The jury returned a verdict of guilty upon both counts without recommending the death penalty, and the judge imposed a sentence of twenty-five years.

The prosecution makes two answers to Parrino's defence that the present indictment was found fourteen years after the crime was committed. The first is that the indictment was for an "offense punishable by death," and might therefore be

1. § 408a and § 408c, Title 18 U.S.C.A. [Revised 18 U.S.C.A. § 1201].

2. § 583, Title 18 U.S.C.A. [Revised 18 U.S.C.A. § 3290].

3. § 408a (1), Title 18 U.S.C.A.

"found at any time" without regard to the three year statute.[4] We agree that the indictment stated all the essentials of the crimes charged, and that it was not necessary to allege that the victim was not released "unharmed" in order that the jury might recommend the death-penalty. That is an allegation going only to the punishment, and, although the accused has to be adequately advised of it, since the jury must pass upon it, it will be enough if he gets the information in season from any source. Indeed, even though the allegation touched one of the elements of the crime itself, the failure to include it would be at worst a "variance," and would "not affect substantial rights," if the accused were given adequate advance opportunity to answer.[5] However, this argument, to which, as we say, we agree, is not relevant to the important issue; which is whether the second indictment was found in time. The statute, when it wiped out all limitation by the words, "punishable by death," did not make the character of the crime the test, but the penalty that could be imposed upon it; and in the case of kidnapping the jury does not get power to impose the death penalty unless the victim has not been released at all, or has been released "harmed." When a crime is made "punishable" by a prescribed penalty—fine, forfeiture, imprisonment, death, or anything else—the choice of the kind and character of the sentence is confided to some authority in its discretion; and it does not become "punishable" by that authority until all the conditions imposed upon the exercise of its discretion have been satisfied. Kidnapping is made "punishable" by two kinds of penalty, and, indeed, by two different authorities. It is "punishable" by either penalty, as soon as the prescribed authority becomes free to exercise its discretion; and the jury becomes free to do so only if the condition is satisfied that the victim has not been released "unharmed." This would be at once apparent, if the discretion as to both penalties were vested in the judge, but

his discretion to impose the death penalty were made conditional upon the finding of a jury that the victim had not been released "unharmed." The situation is the same as in those jurisdictions in which the maximum penalty for a crime depends upon whether the convict is a recidivist; for under such statutes, although the crime remains the same, it is "punishable" by one penalty when he is a recidivist and by another when he is not.

It follows that, if three years pass after a kidnapping, an indictment is barred if the victim has been released "unharmed," within that period. We need not decide whether it would also be barred, if after that period the victim were released "unharmed." That is not before us; and, indeed, it can scarcely be of more than academic interest anyway, for a kidnapped victim will seldom, if ever, be held three years for ransom and then released "unharmed." Since all we know about Rozen's condition at the time of his release, is that a jury *might* have found him "harmed," we cannot tell whether the jury did not recommend the death penalty, because they decided that the victim had been released "unharmed," or because, although they found that he had been released "harmed," they used their discretion in his favor. Therefore, unless the three year statute was tolled by Parrino's flight, the conviction must be reversed and the case remanded for a new trial. The Third Circuit in United States v. Parker[6] has read the statute as we do. The question was whether the trial must be in the county where the offense was committed, which it must, if the offense was capital; and the court gave as one ground for its decision that, since it appeared that the victim had been released "unharmed," that statute did not apply. We can find nothing to the contrary in Robinson v. United States;[7] for, as has already appeared, we too think that the indictment need not allege whether the victim has been released "unharmed."

4. § 581a, 582, Title 18 U.S.C.A. [Revised 18 U.S.C.A. §§ 3281, 3282].

5. Rule 52(a), Rules of Criminal Procedure, 18 U.S.C.A.

6. 103 F.2d 857, 861.

7. 6 Cir., 144 F.2d 392, 396, 397.

■ The alternative argument is that Parrino's flight tolled the three year statute until he should present himself to the district attorney and announce his return. Since it is fantastically improbable that any offender will ever in effect ask to be indicted, unless he means to plead guilty and be sentenced, we refuse to take that possibility seriously. What the prosecution really means is that once a suspected offender "flees from justice," he puts himself in the same class as those guilty of capital offences, and may be prosecuted as long as he lives. That doctrine, if true, will apply to every crime, the most venial as well as the most heinous; it means that, once such a suspect runs away, he hangs his crime about his neck forever, however trivial it may be. No matter how he may redeem himself by years of useful activity, no matter how intimately he may establish ties to others, no matter how dire to them may be the rupture of those ties, no matter how completely time may have destroyed his defence, he must live forever at the mercy of any official who may choose to revive the old charge. That appears to us to frustrate the whole purpose which lies behind any statute of limitations. It is quite true that if the suspect never returns, it is always possible to indict him, but it is reasonable to distinguish between such a one and a suspect who openly returns to his old haunts and starts again. Nor is it in the least necessary to the effective prosecution of crime; for, although it is necessary that absence shall toll the limitation in civil actions, which must ordinarily begin by service on the defendant, that is not true of criminal prosecutions which can be begun by indictment in spite of the flight of the accused, just as was done in the case at bar. Such an indictment will, indeed, hang forever against the accused; but at least it will warn him that the chase is still on, and that he returns at his peril. But what conceivable excuse can there be for dismissing an indictment, and thus publishing an apparent assurance to the accused that he will not be further prosecuted, and then indicting him again, after he has returned and openly resumed his life for the period of the limitation, quite possibly in reliance upon that very assurance? No excuse is suggested, except that it will be highly inconvenient not to be allowed to clear the prosecution's office files of old cases; and to that excuse the kindest answer is silence.

The decisions, put forward as authority for this doctrine, appear on scrutiny to be to the last degree shadowy and fragile. In United States v. White,[8] a majority of the three judges of the old Circuit Court of the District of Columbia at first decided in 1833 that a flight from justice tolled the statute only until the accused returned openly; but upon further consideration Cranch, C. J., changed his mind and with Thruston, J., made a majority the other way.[9] The only reason given was that of Thruston, J., in the first case; he thought that a statute of limitations was "a mere act of grace * * * from the characteristic benignity of our laws;" and that, having once forfeited it, it is not "in the power of the offender * * * to restore himself to the situation he was in before fleeing." We cannot accept that as an adequate statement of the reasons for limiting the prosecution of crime. We need not expatiate upon what these are beyond the circumstances of the case at bar, which we have already detailed at length. The only point decided in Howgate v. United States[10] is that the accused may not "tack" any period, which has elapsed before his "flight," to that which follows his return. Arguendo, we may agree, for the interval between Parrino's return and the indictment was over eight years. True, the opinion of Morris, J., went on to approve the doctrine finally laid down by the majority in United States v. White, supra; but that was entirely foreign to anything before the court. The same is true of anything said in the opinion in McGowen v. United States,[11] where the only question was

8. Fed.Cas.,No.16,675.

9. Fed.Cas.No.16,677.

10. 7 App.D.C. 217, 242–248.

11. 70 App.D.C. 268, 105 F.2d 791, 124 A.L.R. 1047.

whether time spent in serving sentence for another crime should count in tolling the statute. It will be seen therefore that to support the prosecution's position, there is only one decision; and that this turned upon a change of mind of one judge over a hundred years ago. We cannot accept it as ground for holding that a fugitive from justice who openly returns and resumes his accustomed activities, and who so continues for the full period of limitation fixed for the crime, does not gain the immunity which it is the purpose of such statutes to give. The conviction will be reversed and the cause remanded for a new trial in accordance with the foregoing opinion.

Judgment reversed.