08-0837-cr
USA v. Payne

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2008

(Argued: April 22, 2009          Decided: January 5, 2010)

Docket No. 08-0837-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

ADRIAN PAYNE, also known as "A,"

Defendant-Appellant.

_____

Before: KEARSE, SACK, and HALL, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York, John Gleeson, Judge, convicting defendant of racketeering offenses, 18 U.S.C. §§ 1959(a)(1), 1962(c), and 1962(d); and narcotics and firearms offenses, 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 924(c)(1)(A).

Affirmed.

ALI KAZEMI, Assistant United States Attorney, Brooklyn, New York (Benton J. Campbell, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

DONNA R. NEWMAN, New York, New York (Buttermore Newman Delanney & Foltz, New York, New York on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Adrian Payne appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before John Gleeson, Judge, convicting him of violating substantive and conspiracy provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d); two counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II); distributing and possessing with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II); and use of a firearm during and in relation to the commission of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A). Payne was sentenced principally to six terms of life imprisonment on the racketeering, murder, and narcotics counts, to be followed by a 10-year term of imprisonment on the firearms count. On appeal, he contends principally (1) that the murder-in-aid-of-racketeering counts were barred by the statute of limitations, (2) that there was insufficient evidence to support his convictions, and (3) that the court erred in sentencing him to a 10-year consecutive term of imprisonment on the firearms count and made other sentencing errors affecting all counts. Finding no merit in Payne's contentions, we affirm.

## I. BACKGROUND

The present prosecution focused on narcotics distribution and various acts of violence in the East New York section of Brooklyn from 1985 through January 2003. The superseding indictment ("indictment") on which Payne and his codefendant Tyrone ("T-Black" or "Black") Hunter were tried alleged that during that period a number of associated individuals participated in and conducted the affairs of a RICO enterprise by, inter alia, distributing, and conspiring to distribute, cocaine and cocaine base ("crack"), and committing robberies and murders in furtherance of their drug distribution operations. The government's evidence at trial consisted principally of testimony from law enforcement officers and cooperating witnesses, including former enterprise leaders John "Hatchet" Hatcher and Charles "Boo" Thomas. The evidence, viewed in the light most favorable to the government, revealed the following.

### A. The Hatcher-Thomas-Hunter "Family" Enterprise

Hatcher and Thomas, along with others to whom they referred as "family" or "street family" (see, e.g., Trial Transcript ("Tr.") 548, 1172), began selling cocaine in East New York in the mid-1980s, initially selling powder cocaine and then switching to crack cocaine in 1987 because it was more profitable. In 1985, Thomas, then 15 years of age, introduced Hunter to Hatcher, whom Thomas "always . . . considered a boss" (Tr. 1499).

- 3 -

Hatcher invited Hunter to "join my family," which meant "[s]hoot, sell drugs, whatever's necessary." (Id. at 556.) Hunter at first worked for Hatcher as a lookout, protecting the workers who were selling drugs; he was soon made manager of drug-selling spots. The income from crack sales at one of those spots totaled as much as $20,000 to $25,000 a day; for managing that spot, Hatcher paid Hunter $3,000 to $8,000 a week.

Payne, often referred to by the cooperating witnesses as "A," joined the family as Thomas's lieutenant in about 1995. (See id. at 1175, 1612.) His responsibilities included putting the cocaine provided by Thomas into retail sale packages, getting the cocaine to the workers and keeping them supplied, and collecting the proceeds of the sales. (See id. at 1318-20.) On occasion, when Thomas had not bought the necessary cocaine, he would have Payne purchase it. (See id. at 1319.) As weekly compensation for his work as lieutenant, Thomas allowed Payne to keep the profits from one day's drug sales, usually about $1,200. (See id. at 1320-21.)

Thomas fired Payne as lieutenant after about a year, but Payne remained a member of the family and became, inter alia, an enforcer. For example, as described in Part I.A.1. below, in 1997, complying with an "order" from Thomas (Tr. 704), Payne shot and killed a worker who had been stealing from Thomas and sleeping with Thomas's girlfriend. In 1998, Hunter introduced Payne to Hatcher (who had been in prison since 1991) as "my man,"

"a shooter" (id. at 703), a "[n]ew shooter in the family" (id. at 704).

Beginning in 2000, Payne also operated as a crack cocaine dealer, selling his own supplies, at a family spot. (See id. at 740-43.) In addition, about once a month from late 2000 until May 2002, Payne sold bulk quantities--approximately 125 grams--of crack to Hatcher. (See id. at 748, 752-53.)

Thomas testified that family members "made money together" and "hustled together," meaning that they would "[s]ell drugs together" (Tr. 1172), although the family structure was not particularly hierarchical. Thomas identified more than a dozen family members (see id. at 1175-76)--all of whom were allowed to operate in family spots (see, e.g., id. at 1177)--and as a general matter, each member who sold drugs retained the profits from his own sales. Describing this as "eat[ing] what you kill" (id. at 1180), Thomas testified that the family operated in this manner for ease of administration:

> There's too many of us to all try to put all the money in one pot.
>
> Q. Were you still a family at that point, even though you were eating what you were killing?
>
> A. Yes.

(Id. at 1641-42.) Although they did not pool their profits, members of the family "looked out for each other," meaning that "if one of us was broke, another one would give out some money" (id. at 1172).

In addition, the family supported its members who were arrested or in prison. Hunter and Hatcher, who spent various parts of the 1985-2003 period in prison, were prime examples. When Hunter was arrested in 1989, Thomas raised "money to bail him out" because "that's what we do for each other." (Tr. 1263.) While Hunter was thereafter imprisoned, Hatcher continued to provide him with proceeds from drug sales because Hunter "was part of my family, so he's gonna get money regardless, whether he was in jail or out of jail." (Id. at 630-31.) When Hatcher himself went to prison in 1991, Hunter bought his drug spots for $70,000 and made additional payments totaling approximately $200,000 to Hatcher's wife and father while Hatcher was serving his sentence. (See id. at 682.) When Hunter was imprisoned again in 1994-1996, Thomas provided Hunter's wife and brother with money for Hunter because family "take[s] care of each other" (id. at 1312-13). When Hunter was released from prison in 1996, Thomas and Payne took him shopping and bought him a motorcycle (see id. at 1326); and some two months later, Thomas made Hunter a partner in his drug operation because Hunter was "part of the family and we always said [if] you don't have money, come back to the block" (id. at 1327).

When Thomas and Hunter operated as partners, the center of their operations was the corner of Georgia and Hegeman Avenues and an adjacent block along Hegeman ("Georgia/Hegeman"). Pooling their money for bulk purchasing of crack cocaine, one or the other would make a purchase from a supplier, and each would divide half

of the amount purchased into salable packages. Thomas and Hunter then alternated sale days, each selling his half of the crack (through the workers they shared), and retaining the proceeds of the sales made on his own day. (See, e.g., id. at 1327, 1388.)

In 1999, Thomas and Hunter had a falling out, and their partnership ended. Hatcher became Thomas's new partner, and as partners they operated in the same way that Thomas and Hunter had. Thomas and Hatcher alternated days selling crack at Georgia/Hegeman, sharing the workers who did the actual selling, and using some of the same locations to stash their narcotics supplies and their guns. (See Tr. 740-41, 1417-24.) Thomas testified that he and Hatcher did not always operate as partners, but they were always part of the family. (See id. at 1588.)

The hours during which Thomas and Hatcher sold crack at Georgia/Hegeman were approximately 9 a.m. to 10 p.m. Beginning in 2000, Thomas, Hatcher, and Payne agreed that Payne and workers he hired would sell at that spot at night after 10 p.m., and that Payne would retain the proceeds of his sales. (See id. at 740, 743, 748, 1427-28, 1436.) Payne discussed his operations with Thomas, telling Thomas that he kept his drug supplies and guns at the homes of his girlfriends and some of his sellers (see id. at 1426-27), and that he obtained some of his supplies by robbing other drug dealers of drugs and money (see id. at 1376, 1423). When Payne stole drugs, he sold half and gave the other half to Hatcher. (See id. at 1423.)

### 1. The Murder of Eric Clemons

Payne's position as Thomas's lieutenant had lasted until sometime in 1996 (see Tr. 1322), when Thomas's friend Eric "Sui" Clemons returned from prison and sought to join the drug distribution operation (see id. at 1324). Thomas was dissatisfied with Payne's work as a lieutenant because the sellers would run out of drugs to sell and Payne was lax about replenishing their supplies. Accordingly, in 1996, Thomas replaced Payne in that position with Clemons. (See id.) Thomas testified that Payne "stayed around," however, available to help if "we needed him for something" or "if something happened." (Id. at 1325; see also id. at 1172 (members of the family "protected each other," meaning that if "[s]omebody d[id] something to one of us, the rest of us would go looking for the person and do something to him" to retaliate); id. at 1326-28 (Payne's services to Thomas's drug distribution operation after Payne was fired as Thomas's lieutenant were sufficiently valuable that Hunter, after becoming Thomas's partner in that operation, tried (unsuccessfully) to persuade Thomas that the partnership's profits should be split three ways, to include Payne).)

Payne was "upset" at being replaced as Thomas's lieutenant (Tr. 704, 1325); Payne also believed that Clemons was a "snitch" because Clemons had gone to jail at the same time as his codefendants, and only Clemons had been released (see id. at 1325). Hunter, who was released from prison in 1996 after Clemons

had succeeded Payne, also believed Clemons was a snitch and expressed that view to Thomas (see id. at 1328).

In early 1997, Thomas realized that someone was stealing cocaine from his operation; he at first suspected Billy Lopez, who sold for Thomas and in whose Hegeman Avenue home Thomas stashed cocaine until it could be individually packaged and distributed. Thereafter, however, noticing that Clemons was spending money lavishly, Thomas realized that it was Clemons who was stealing from him. Also in 1997, Thomas became aware that his girlfriend was having an affair with Clemons. To punish Clemons for showing such disrespect for him, Thomas shot Clemons in the leg.

Thomas described these events to Payne and Hunter, who reiterated their belief that Clemons was also a snitch. (See Tr. 1338-39.) Thomas testified that Payne advised him that, for disrespecting him, Clemons should be killed. Thomas agreed and he, Hunter, and Payne promptly armed themselves and prepared to kill Clemons. (See id. at 1340-41.)

Thomas telephoned Lisa Toney, the woman with whom Clemons had been staying after returning from prison. Thomas told her that Clemons had been stealing from him and was sleeping with Thomas's girlfriend; he also disclosed that Clemons had yet another girlfriend as well. Thomas asked Toney to let him know when she learned Clemons's whereabouts. Toney soon informed Thomas that Clemons would shortly be arriving at her home by taxi. Hunter then drove Thomas and Payne to Toney's address in time to intercept Clemons. As Clemons attempted to exit the cab, Thomas

approached from one side and Payne approached from the other. (See Tr. 1346-47.) Payne "lean[ed] into the car" and shot Clemons "[a]t least six or seven" times (id. at 1347-48); Clemons died from his wounds (see id. at 1358). Thomas and Payne fled in the car driven by Hunter. (See id. at 1349.)

Hatcher was in prison at the time of the Clemons murder, but Hunter informed him of it. When Hatcher was released in June 1998, Hunter and Payne picked him up, and Hunter introduced Payne as the "[n]ew shooter in the family" (id. at 704). Hatcher and Payne thereafter had several discussions about the details of the murder. Hatcher testified that Payne said he was glad "[w]hen 'Boo' gave the order for [Clemons] to be killed," because Payne had never liked Clemons and had been "upset" when Thomas gave Clemons Payne's job as lieutenant. (Id.)

2. The Robbery of Tacuma Kinsey

Tacuma Kinsey was the brother of one of Payne's girlfriends. In April 1998, Kinsey's friend Michael Johnson, who worked for an armored car company that picked up money from a K-Mart store, devised a plan to steal the money. Johnson provided Payne and Kinsey with company uniforms, and Payne and Kinsey went to K-Mart posing as armored car guards. (See Tr. 1111-16.) K-Mart employees handed Kinsey bags containing checks and approximately $100,000 in cash.

Returning to Johnson's house, Payne, Kinsey, and Johnson divided the money, with Kinsey and Payne each receiving $30,000,

and Johnson receiving the rest. (See id. at 1116-17.) Kinsey returned home and hid most of his share in his closet.

Payne had previously described the K-Mart plan to Thomas, but he did not disclose his participation in the eventual robbery. When Hunter learned of the K-Mart robbery, he and Payne told Thomas that Kinsey had robbed the K-Mart without them. (See id. at 1385-86.) Hunter, angry that Kinsey had excluded Hunter (and, he believed, Payne) from participation in that lucrative robbery, decided that Kinsey himself should be robbed. Thus, at about 4 a.m the following morning, Payne and Hunter (and a third man whom Kinsey did not recognize) broke into Kinsey's room (see id. at 1119-20). They held Kinsey at gunpoint, tied him up, and beat him, repeatedly hitting him in the face with a gun, and stole his hidden stash of K-Mart money. (See id. at 1120-22.)

### 3. The Murder of Pedro Newton

Pedro Newton was a "friend" with whom Thomas had grown up. In January 2000, Newton acquired 100 grams of heroin from "some Colombians," and he asked Thomas to help him find a buyer. Since Thomas did not deal in heroin, he introduced Newton to Henry "Boobie" Harley, who bought the heroin from Newton for $7,000. (See Tr. 1390-95.) After making that sale to "Boobie," Newton told Thomas and "Boobie" that Newton would soon have an additional 600 grams of heroin and that he hoped "Boobie" would buy that too. "Boobie," however, decided that Newton should be robbed of the 600 grams of heroin, rather than paid for it (see id. at 1395-96), and

- 11 -

he wanted Newton killed in order to avoid any retaliation for the robbery (see id. at 1978). After "Boobie" told Thomas of his plan, Thomas enlisted Hatcher to rob and kill Newton (see id. at 728). Hatcher enlisted Payne, who had become Hatcher's "robbing buddy" (id. at 729); and Payne and Hatcher then persuaded Thomas that they should "rob [Newton] before 'Boobie' and them get to rob him" (id. at 1398).

To implement their plan, Thomas told Newton that Hatcher would buy the 600 grams of heroin, which Newton was to bring to Billy Lopez's house on January 27, 2000. When Newton arrived, Thomas escorted Newton to the basement, where Payne and Hatcher were hiding. Payne jumped out from behind a wall, put a gun to Newton's head, and ordered him to the floor; Thomas grabbed Newton's bag of heroin and ran back upstairs. (See Tr. 732, 1402-03.) As Newton was lying on the floor with Payne's gun pointed at his head, Hatcher shot Newton in the base of the skull. (See id. at 732-33.) Thomas thereafter sold Newton's heroin to "Boobie" for $30-$45,000. The proceeds were split among Thomas, Hatcher, and Payne, with Payne receiving $13,000. (See id. at 738, 1412.)

B. The Present Prosecution

Thomas and Hatcher were arrested in May 2002. They agreed to cooperate with the government and testified at the trial of Payne and Hunter as indicated above. Payne continued to sell drugs on Hegeman Avenue until he was arrested in January 2003.

(See Tr. 2365, 2379-82.) In postarrest searches of the homes of Payne's workers and one of his girlfriends, law enforcement authorities seized, _inter alia_, handguns, ammunition, drug packaging material, and other paraphernalia bearing crack residue.

The original indictment in this case was filed on March 7, 2005, contemporaneously with the issuance of an arrest warrant for Hunter. The superseding indictment on which Payne and Hunter were tried included charges of participation in and conduct of the affairs of a RICO enterprise--to wit, the Hatcher-Thomas-Hunter drug distribution family--through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (count one); RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (count two); the murders of Clemons and Newton in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (counts four and six, respectively); conspiracy to distribute, and to possess with intent to distribute, crack and powder cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II) (count ten); distribution of, and possession with intent to distribute, crack and powder cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II) (count eleven); and use of a firearm during the commission of the drug trafficking offenses charged in counts ten and eleven, in violation of 18 U.S.C. § 924(c)(1)(A) (count twelve). Payne was also initially charged in other counts that were eventually dismissed on motion pursuant to Fed. R. Crim. P. 29--at or after trial--for untimeliness, in that the offenses were completed prior to March 7, 2000, _i.e._, more than five years before the March 7,

2005 filing of the original indictment, see 18 U.S.C. § 3282(a), or for insufficiency of the evidence.

To the extent pertinent to this appeal, the jury found Payne guilty on the seven counts listed above. In finding him guilty of racketeering (count one) and racketeering conspiracy (count two), the jury found that the government had proven that Payne committed various racketeering acts ("RAs"): distributing and conspiring to distribute crack and powder cocaine (RAs 1B and 1A), murdering and conspiring to murder Clemons (RAs 7B and 7A), robbing and conspiring to rob Kinsey (RAs 8B and 8A), and robbing and murdering Newton, and conspiring to do so (RAs 9B, 9C, and 9A).

Payne was sentenced principally to six terms of life imprisonment on the racketeering, murder, and narcotics counts, and to a consecutive term of 10 years' imprisonment on the firearms count.

On this appeal, Payne challenges his convictions on two principal grounds, arguing (A) that the § 1959(a)(1) murder-in-aid-of-racketeering counts should have been dismissed because the murders of Clemons and Newton occurred in May 1997 and January 2000, respectively, prior to the five-year limitations period provided by 18 U.S.C. § 3282(a); and (B) that the evidence was insufficient to support his conviction on any count. We are unpersuaded.

A. <u>Statute of Limitations for Murder in Violation of § 1959(a)(1)</u>

The federal criminal code contains two general statute-of-limitations provisions. The usual limitations period is five years:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, <u>not capital</u>, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 U.S.C. § 3282(a) (emphasis added). However, "[a]n indictment for any <u>offense punishable by death</u> may be found at any time without limitation." <u>Id</u>. § 3281 (emphasis added).

Section 1959, to the extent pertinent to this appeal, provides that

> (a) <u>Whoever</u>, . . . <u>for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders</u> . . . any individual in violation of the laws

of any State or the United States, . . . shall be punished--

(1) for murder, by death or life imprisonment, or a fine under this title, or both . . . .

18 U.S.C. § 1959(a)(1) (emphases added). The term "enterprise" in § 1959(a), like the RICO definition of enterprise, see id. § 1961(4), "includes any . . . group of individuals associated in fact although not a legal entity," id. § 1959(b)(2).

Payne contends that the § 1959(a)(1) murder-in-aid-of-racketeering counts against him were "not capital" offenses, 18 U.S.C. § 3282(a), i.e., were not "punishable by death" within the meaning of § 3281, because in order to permit imposition of the death penalty in accordance with the Federal Death Penalty Act, 18 U.S.C. § 3591 et seq., an indictment is required to allege, and the jury is required to find, an aggravating factor set out in § 3592(c), see, e.g., id. § 3593(d) ("[i]f no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death"), and here there was no allegation or finding of any such aggravating factor. In so arguing, Payne relies principally on a half-century-old interpretation of "punishable by death," see United States v. Parrino, 180 F.2d 613 (2d Cir. 1950) ("Parrino"), that has been overtaken by more recent cases.

In Parrino, this Court considered a statute that made kidnaping punishable by death, if the jury so recommended, in cases in which the victim had not been released unharmed, see 18 U.S.C. § 408a (1946). We held that the elimination, by the

- 16 -

predecessor of § 3281, of any time limitation on the prosecution of an offense "'punishable by death[]' did not make the character of the crime the test." 180 F.2d at 615. We stated that an offense "does not become 'punishable' by [the decisionmaker] until all the conditions imposed upon the exercise of [the decisionmaker's] discretion have been satisfied," id. (emphases added), i.e., unless and until all of the factors warranting imposition of the death penalty have been found by the factfinder. This interpretation of "punishable by death" has not been followed, however, either by the Supreme Court in interpreting the same kidnaping provision, or by this Court in interpreting other statutes, including § 1959(a)(1).

In Smith v. United States, 360 U.S. 1 (1959), the Supreme Court considered whether a prosecution under the kidnaping statute that was at issue in Parrino, recodified at 18 U.S.C. § 1201 (Supp. II 1949), could be initiated by the filing of an information rather than an indictment, given the Fifth Amendment's provision that, in general, "[n]o person shall be held to answer for a capital . . . crime unless on a presentment or indictment of a Grand Jury," id. at 6 (internal quotation marks omitted), and given the Fed. R. Crim. P. 7(a) provision that "[a]n offense which may be punished by death shall be prosecuted by indictment," id. (internal quotation marks omitted) (emphases in Smith). The Smith Court indicated that whether an offense is punishable by death depends on the punishments authorized by the charging statute,

rather than the appropriateness of that penalty in light of the proof at trial:

> Under the statute, [interstate kidnapping] is punishable by death if certain proof is introduced at trial. When an accused is charged, as here, with transporting a kidnapping victim across state lines, he is charged and will be tried for an offense which _may_ be punished by death. Although the imposition of that penalty will depend on whether sufficient proof of harm is introduced during the trial, that circumstance does not alter the fact that the offense itself is one which _may_ be punished by death and thus must be prosecuted by indictment. In other words, when the offense as charged is sufficiently broad to justify a capital verdict, the trial must proceed on that basis, even though the evidence later establishes that such a verdict cannot be sustained because the victim was released unharmed. It is neither procedurally correct nor practical to await the conclusion of the evidence to determine whether the accused is being prosecuted for a capital offense.

360 U.S. at 8 (emphases in original).

This Court reached a similar conclusion in United States v. Kostadinov, 721 F.2d 411 (2d Cir. 1983) ("Kostadinov"), in which the question was whether a provision authorizing the denial of pretrial bail for a person "charged with an offense punishable by death," 18 U.S.C. § 3148 (Supp. IV 1969), authorized the district court to deny bail where the government was not seeking the death penalty. We upheld the denial of bail, ruling that "the purpose of the 'capital case' distinction in the bail statute derives from the nature of the offense with which a given defendant is charged and not from the potential severity of the punishment." 721 F.2d at 412 (emphasis added) (other internal quotation marks omitted).

- 18 -

Just as that provision curtailing the defendant's right to bail reflects the seriousness of the alleged offense, a provision that subjects a person accused of certain crimes to prosecution without time limitation reflects the serious nature of those crimes. See, e.g., United States v. Manning, 56 F.3d 1188, 1196 (9th Cir. 1995) (in § 3281, "Congress has made the judgment that some crimes are so serious that an offender should always be punished if caught"). Accordingly, in United States v. Petrucelli, 97 F. App'x 355, 359-60 (2d Cir.) ("Petrucelli"), cert. denied, 543 U.S. 993 (2004), we adopted the Kostadinov interpretation of "punishable by death" in considering whether a charge of murder in aid of racketeering in violation of § 1959(a)(1) is governed by § 3281 or § 3282(a). We concluded that § 1959(a)(1)'s prohibition against murder in aid of racketeering activity "describes an offense 'punishable by death' within the meaning of 18 U.S.C. § 3281," 97 F. App'x at 360, despite the defendant's contention that "none of the aggravating factors which would have justified a death sentence" were--or could have been--alleged in the indictment, id. at 359. We stated:

> Kostadinov held that, irrespective of whether the death penalty was sought by the government, the appellant's crime was properly categorized as being punishable by death simply because the death penalty was authorized by the statute under which the appellant was charged. In accordance with Kostadinov, we find that 18 U.S.C. § 1959(a)(1) describes an offense "punishable by death" within the meaning of 18 U.S.C. § 3281.

97 F. App'x at 359-60. Although we decided <u>Petrucelli</u> by nonprecedential summary order, rather than by opinion, our "[d]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases," Order dated June 26, 2007, adopting 2d Cir. Local R. 32.1.

In any event, we agree with <u>Petrucelli</u> that, in determining whether an offense is "punishable by death" within the meaning of § 3281--a provision designed to deny the defendant any right of repose--we look to the character of the offense and the penalties that are set out by statute. An offense "punishable by death," within the meaning of § 3281, is one for which the statute authorizes death as a punishment, regardless of whether the death penalty is sought by the prosecution or ultimately found appropriate by the factfinder or the court. Because § 1959(a)(1) provides that a person who "murders" in aid of racketeering may be "punished . . . by death," we conclude that the indictment for that offense "may be found at any time without limitation," 18 U.S.C. § 3281.

Our Sister Circuits that have considered arguments that the five-year statute of limitations in § 3282 applies to other murder offenses that are "punishable by death" have likewise concluded that § 3281, rather than § 3282 applies. <u>See</u>, <u>e.g.</u>, <u>United States v. Ealy</u>, 363 F.3d 292, 296-97 (4th Cir.) (murder in furtherance of a continuing criminal enterprise and murder of a witness, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 1512(a)(1)(C): "whether a crime is 'punishable by death' under

§ 3281 or '[not ]capital' under § 3282 depends on whether the death penalty may be imposed for the crime under the enabling statute, not on whether the death penalty is in fact available for defendants in a particular case" (other internal quotation marks omitted) (emphasis in Ealy)), cert. denied, 543 U.S. 862 (2004); United States v. Edwards, 159 F.3d 1117, 1128 (8th Cir. 1998) (murder by arson, in violation of 18 U.S.C. § 844(i): § 3281 applicable even though the death penalty procedures in the charging statute had been ruled unconstitutional), cert. denied, 528 U.S. 825 (1999); United States v. Manning, 56 F.3d at 1196 (murder by mail bomb, in violation of 18 U.S.C. § 1716(a): "the statute of limitations provisions of sections 3281 and 3282 are inextricably tied to the nature of the offense"); id. ("sections 3281 and 3282 . . . derive their justification from the serious nature of the crime rather than from a concern about, for example, what procedural protections those who face a penalty as grave as death are to receive").

Accordingly, we reject Payne's contention that the five-year statute of limitations barred his prosecution under § 1959(a)(1) for the murders of Clemons and Newton in aid of racketeering.

B. Sufficiency of the Evidence

Payne contends that his convictions should be overturned on the grounds that there was insufficient evidence to prove (1) that there existed a RICO enterprise, (2) that there was a single

- 21 -

narcotics conspiracy as alleged in the indictment, rather than a group of individual, independent drug dealers, and that he was a member of the conspiracy (and the enterprise) alleged in the indictment, (3) that he committed the Clemons and Newton murders for the purpose of furthering his position within the RICO enterprise, and (4) that the racketeering acts concerning the Clemons and Newton murders and the robberies of Newton and Kinsey established a pattern of racketeering.

Our standard of review for sufficiency challenges is well established. We must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor. See, e.g., United States v. Chavez, 549 F.3d 119, 124-25 (2d Cir. 2008); United States v. Eppolito, 543 F.3d 25, 45-46 (2d Cir. 2008) ("Eppolito"), cert. denied, 129 S. Ct. 1027 (2009); United States v. Pimentel, 346 F.3d 285, 295 (2d Cir. 2003), cert. denied, 543 U.S. 955 (2004). Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury. "[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses . . . ." United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998); see, e.g., United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004). We must uphold the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307,

319 (1979) (emphasis in original). Given these principles, we reject all of Payne's sufficiency challenges.

### 1. Existence of the RICO Enterprise

The indictment alleged that from 1985 through January 2003 a number of associated individuals participated in and conducted the affairs of a RICO enterprise by, inter alia, distributing crack and powder cocaine and committing robberies and murders in furtherance of their drug distribution operations. RICO defines the term "enterprise" to include "any . . . group of individuals associated in fact." 18 U.S.C. § 1961(4). The existence of a RICO enterprise may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). "'[A]n association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.'" United States v. Jones, 482 F.3d 60, 69-70 (2d Cir. 2006) (quoting United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir. 1991), cert. denied, 503 U.S. 941 (1992) (emphasis in Coonan)), cert. denied, 549 U.S. 1231 (2007). "An 'individuals associated in fact' enterprise, 18 U.S.C. § 1961(4), may continue to exist even though it undergoes changes in membership." Eppolito, 543 F.3d at 49; see, e.g., Coonan, 938 F.2d at 1560-61.

Although Payne contends that the evidence at trial merely showed a group of "neighborhood friends" who "may have given each

- 23 -

other sporadic assistance" (Payne brief on appeal at 60), that characterization plainly does not view the evidence in the light most favorable to the government. As described in Part I.A. above, there was testimony by Thomas and Hatcher that there were more than a dozen individuals distributing narcotics in the East New York section of Brooklyn; although there was no highly structured organization, Thomas and Hatcher testified that these individuals were members of a "family" or "street family" who "made money together," i.e., they would "sell drugs together," "protect[] each other," and take "care of each other" by providing funds for family members who were "broke" or in jail. The family was protective of its territory, allowing family members to sell drugs at family spots, coordinating family members' selling hours if they used the same spot and otherwise avoiding conflicts with one another, excluding nonmembers of the family from those spots, and using violence against rivals who attempted to possess or repossess family spots. Thomas and Hatcher, by their own accounts at trial, were members of the family from the mid-1980s until they were arrested in connection with this case in 2002 and began to cooperate with the government. The evidence permitted the inference that Hatcher was a member of the family throughout that period even though he was in prison during most of the 1990s. While he was in prison, Hunter paid Hatcher's wife and father some $200,000; and Hatcher (who "was always a person [Thomas] considered a boss" (Tr. 1499)) kept track of what was going on in family territory through periodic reports from Hunter (see id. at

687-90). When family members were released from prison, other family members promptly saw to it that they were supplied with money and guns. Thus, the evidence to establish the existence of a group of drug dealers who were associated in fact was abundant.

There was also ample testimony that Payne became a member of the family in 1995 and fulfilled various family needs thereafter. At first he was a lieutenant for Thomas, packaging cocaine, keeping the workers supplied, collecting the proceeds of the sales, and occasionally making the purchases from Thomas's suppliers. Although Payne lost his lieutenant position in 1996, the evidence easily permitted the jury to infer that he remained a member of the family, as Thomas testified that Payne was there to provide whatever assistance was needed. Indeed, Hunter, as Thomas's drug-selling partner, considered Payne's post-lieutenancy services so integral to their operations that he tried in 1996 to persuade Thomas that the partnership's profits should be split three ways, to include Payne. In 1997, when Thomas confided to Hunter and Payne that Clemons had slept with Thomas's girlfriend, Payne participated in the ambush of Clemons and shot him to death. When Hatcher was released from prison in 1998 and arrived in Manhattan, Hunter and Payne picked him up, and Payne was introduced to Hatcher as a new "shooter in the family"; thereafter, Payne and Hatcher became "robbing budd[ies]." When Thomas and Hatcher decided to rob and kill Newton in 2000, Hatcher enlisted Payne. In 2000, Thomas, Hatcher, and Payne agreed that Payne would distribute drugs at the Thomas-Hatcher partnership

spot during the nighttime hours when Thomas and Hatcher were not operating; Payne would not have been allowed to sell there had he not been a member of the family (see, e.g., id. at 1436, 1630). And when Payne obtained narcotics by robbing other drug dealers, he gave half of the stolen drugs to Hatcher.

In sum, Payne's contention that the evidence was insufficient to permit inferences that the RICO enterprise alleged in the indictment existed, and that he participated in it, borders on the frivolous.

2.  Existence of a Single Narcotics Conspiracy

Payne's contention that the evidence was insufficient to show his participation in the single drug distribution conspiracy alleged in the indictment--i.e., a conspiracy "between 1985 and January 2003, both dates being approximate and inclusive"--fares no better. "[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." United States v. Geibel, 369 F.3d 682, 689 (2d Cir.) (internal quotation marks omitted), cert. denied, 543 U.S. 999 (2004). "Changes in membership[ and/or] differences in time periods . . . do not necessarily require a finding of more than one conspiracy." United States v. Jones, 482 F.3d at 72. "In the context of narcotics operations . . . we have held that even where there are multiple groups within an alleged conspiracy, a single

conspiracy exists where the groups share a common goal and depend upon and assist each other, and we can reasonably infer that each actor was aware of his part in a larger organization where others performed similar roles." United States v. Berger, 224 F.3d 107, 115 (2d Cir. 2000) (internal quotation marks omitted).

"The matter of whether there existed a single conspiracy as charged in the indictment," or instead multiple conspiracies that did not include the conspiracy alleged, "is a question of fact for a properly instructed jury." United States v. Chavez, 549 F.3d at 125 (internal quotation marks omitted). Even if multiple conspiracies are found, the jury should convict the defendant if it finds that one of the proven conspiracies was the one alleged in the indictment and that the defendant was a member of it. See, e.g., United States v. Thompson, 76 F.3d 442, 454 (2d Cir. 1996); United States v. Lam Lek Chong, 544 F.2d 58, 68 (2d Cir. 1976), cert. denied, 429 U.S. 1101 (1977); United States v. Tramunti, 513 F.2d 1087, 1107 (2d Cir.), cert. denied, 423 U.S. 832 (1975). We will affirm the jury's verdict unless, on the evidence presented, no rational factfinder could have found that the conspiracy alleged in the indictment existed.

The district court here properly instructed the jury that it could not find Payne guilty on count ten unless it found that the government had proven the existence of the conspiracy alleged in the indictment and Payne's membership in that conspiracy; and we see no basis on which to overturn the jury's verdict. Payne's contentions (a) that "[t]here was not one narcotic[s] conspiracy

- 27 -

spanning eighteen years but a host of conspiracies, actually a variety of drug dealers, friendly, but running separate business[es]" (Payne brief on appeal at 55), and (b) that his association with the family ended in 1996 when he was fired as Thomas's lieutenant (see id. at 56; see also id. at 45 (arguing that Payne "was thrown out of the group")) are belied by the evidence discussed in Parts I.A. and II.B.1. above. The jury was entitled to find that the alleged conspiracy existed in light of the evidence that Thomas and Hatcher became members of the drug distribution "family" in the mid-1980s; that, by agreement, family members would "[s]ell drugs together" (Tr. 1172), coordinating and not competing with each other (see, e.g., id. at 743, 708-09), and supporting each other with money, weapons, and retaliatory actions when needed; that Thomas sold drugs throughout the 1985-2002 period; that although Hatcher spent several years in prison in the 1990s, he remained a member of the drug distribution family and was supported monetarily while incarcerated; that when Hunter was released from prison in 1996, Payne and Thomas helped him financially (see id. at 1326); that when Hatcher was released from prison in 1998, Payne and Hunter helped him financially (see id. at 709-10); and that Hatcher, upon his release from prison, could have, as a family member, sold drugs on the same block as Thomas, but he declined because that would have been "a conflict of interest" as Hatcher and Thomas were "family, period" (id. at 708-09). Hatcher said, "We don't do business like that. Why would we compete against ourselves?" (Id. at 709.)

The record also included evidence that Hunter was a member of the conspiracy throughout the period alleged in the indictment, working first with Hatcher and later with Thomas. Although in and out of jail with considerable frequency, he was supported during periods of incarceration by Thomas and/or Hatcher. On at least one occasion while Hunter was incarcerated, he was consulted by Hatcher with respect to the appropriateness of killing a person who was acting in a manner detrimental to the interests of the family. (See id. at 634-37.)

The evidence discussed in Parts I.A. and II.B.1. above showed that Payne joined the ongoing conspiracy in 1995. He served as a lieutenant for Thomas in the procurement, packaging, delivery, and protection of crack cocaine in 1995-1996; as a killer and robber at the behest of Thomas in 1997 and 2000; as a robbery partner of Hunter in 1998; as a robbery partner of Hatcher after Hatcher was released from prison in 1998 and through at least January 2000; as a supplier of drugs to Hatcher in and after 2000; and, by agreement with Thomas and Hatcher, as a fellow seller of crack at Georgia/Hegeman beginning in 2000.

In sum, the evidence was ample to permit the jury to find that there was, as alleged in the indictment, a single ongoing narcotics conspiracy of which Hatcher, Thomas, and Hunter were core members, and that Payne was a member of that conspiracy, joining in 1995 and continuing to participate in it at least until Thomas and Hatcher were arrested in connection with this case in 2002.

### 3. Murder To Increase or Maintain Payne's Enterprise Position

Payne contends that the evidence was insufficient to establish that his motivation in participating in the murders of Clemons and Newton was to further his position in the Hatcher-Thomas-Hunter enterprise, based in part on his contention that he had been "thrown out of the group" in 1996 (Payne brief on appeal at 45). Again, we disagree.

Section 1959(a)'s phrase "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity" is to be interpreted in accordance with "its plain terms," giving those terms their "ordinary meaning," United States v. Dhinsa, 243 F.3d 635, 671 (2d Cir.), cert. denied, 534 U.S. 897 (2001). "Thus, on its face, section 1959 encompasses violent crimes intended to preserve the defendant's position in the enterprise or to enhance his reputation and wealth within that enterprise." Id. (emphases in original). Further, maintaining or increasing his position in the RICO enterprise need not have been the defendant's sole, or even his principal, motivation. Rather, "the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." United States v. Pimentel, 346 F.3d at 295-96 (internal quotation marks omitted).

Here, the record was ample to permit the jury to infer that Payne was not in fact "thrown out of the group" in 1996 but rather remained a member of the family enterprise, and that he participated in the Newton and Clemons murders--as asked or ordered (see, e.g., Tr. 704 ("'Boo' gave the order for [Clemons] to be killed")) to do by the principal leaders of the enterprise-- with the requisite motivation. As described in Part I.A.1. above, after losing his lieutenant position to Clemons, Payne nonetheless remained a member of the family; Thomas testified that Payne thereafter "stayed around" to "help us" if "we needed him for something." Both Thomas and Hatcher testified that Payne was "upset" that he had been replaced as lieutenant by Clemons, and the jury was entitled to infer that Payne's subsequent actions toward Clemons--including accusing Clemons of being a "snitch" who might jeopardize the family's security, advising Thomas that Clemons be killed, and finally shooting and killing Clemons as ordered by Thomas--all reflected a desire by Payne to regain his lieutenancy and/or to enhance his position in the family.

The evidence as to the killing of Newton was also sufficient to support an inference that Payne assisted in that murder in part in order to maintain his position in the family. The enterprise's purpose in robbing Newton of his 600 grams of heroin was to enrich core members of the family; the purpose of murdering Newton was to minimize the possibility of reprisals for that robbery. Payne was asked to participate by Hatcher, an enterprise "boss" (id. at 1499). It was plainly permissible for

- 31 -

the jury to infer that Payne complied with Hatcher's request to participate in that murder in order to maintain or increase Payne's position in the enterprise.

### 4. Pattern of Racketeering Activity

Finally, we reject Payne's contention that the murders of Clemons and Newton and the robberies of Newton and Kinsey lacked the relatedness needed to establish a pattern of racketeering activity, as required by 18 U.S.C. § 1962(c). The pattern requirement is designed "to prevent the application of RICO to the perpetrators of isolated or sporadic criminal acts." United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir.) (internal quotation marks omitted), cert. denied, 493 U.S. 811 (1989). Thus, "to prove a pattern of racketeering activity a . . . prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989) (emphasis omitted). To meet this test, the racketeering acts must be related both to each other and to the enterprise. See, e.g., United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir.), cert. denied, 503 U.S. 950 (1992). "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc., 492 U.S. at 240 (internal quotation marks omitted) (emphases

ours).  "[E]vidence of prior uncharged crimes and other bad acts that were committed by defendants[]" may be "relevant . . . to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity by each defendant[]."  United States v. Diaz, 176 F.3d 52, 79 (2d Cir.), cert. denied, 528 U.S. 875 (1999).

The evidence as to the killings of Clemons and Newton and the robberies of Newton and Kinsey easily met these tests.  The robberies were related to the enterprise because they were designed to enrich core members of the enterprise.  Thus, the robbery of Kinsey, instigated by Hunter, enriched Hunter and Payne, along with a third person, by nearly $30,000.  The robbery of Newton, as planned by Hatcher, Thomas, and Payne, enriched them by the $30-$45,000 that "Boobie" paid them for Newton's heroin.  The murders of Newton and Clemons were related to the enterprise because they, inter alia, reduced the risk of interference with the enterprise's operations.  By killing Newton, the family minimized the chance of retaliation by the persons from whom Newton had obtained the heroin.  By killing Clemons, the family both punished a worker for disrespecting his boss, thereby promoting internal discipline, and eliminated a person suspected of being a "snitch," thereby reducing the threat of interruptions by law enforcement.  Thus, the purposes of murdering Newton and Clemons were or included facilitation of the enterprise's continuation of its criminal activities.

These racketeering acts were related to each other not only by their shared purposes but also by the commonality of the participants and the ways in which they were committed. The same methods were used to achieve the enterprise's goals. In each case at least two men attacked the victim at gunpoint; and in each case the victim was brutally physically assaulted, despite the fact that each was supposedly a friend of the family. Payne was a participant in all of these events; and in each of them his co-participants were either Thomas and Hunter, or Hunter, or Thomas and Hatcher. These robberies and assaults in furtherance of the enterprise's purposes were hardly isolated incidents. The essence of being a family member was described by Hatcher and Thomas as "sell[ing] drugs" and "[s]hoot[ing]" (Tr. 556), and retaliating if "[s]omebody d[id] something to one of us" (id. at 1172). In addition to evidence as to the crimes specified as Payne's racketeering acts, there was other evidence that Payne was committing robberies in the late 1990s while Hatcher was still in prison (see id. at 1362); that after Hatcher was released from prison he and Payne "were doing robberies" together (id. at 1375; see also id. at 724, 729); that Payne "used to rob drug dealers and get the money so that he could get drugs from them so that they could sell them on the block" (id. at 1376); that Payne and Hunter attempted unsuccessfully to rob, and had planned to kill, a woman they believed to possess $500,000 belonging to her bank-robber boyfriend (see id. at 1375-83); and that Payne, because he was "part of the family" (id. at 1452), participated in repeated

attempts to locate, and kill, two individuals who had shot Thomas (see, e.g., id. at 1446-52).

In sum, the evidence was more than sufficient to permit the jury to find that the murders of Clemons and Newton and the robberies of Newton and Kinsey were not isolated incidents but instead were part of a pattern of racketeering activity.

III.    SENTENCING CHALLENGES

Payne also contends that the sentence imposed on him is unreasonable. His most precise challenges are to the 10-year term of imprisonment imposed on the firearms count; he also makes a number of general challenges to the sentencing proceedings with respect to the other counts. We find no merit in his contentions.

A.    The 10-Year Sentence on the Firearms Count

Section § 924(c)(1)(A), under which the court sentenced Payne to 10 years' imprisonment as a mandatory minimum, to be served consecutively to his terms of life imprisonment on the RICO, murder-in-aid-of-racketeering, and narcotics counts, provides as follows:

> (c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in

- 35 -

> furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
>
>> (i) be sentenced to a term of imprisonment of not less than 5 years;
>>
>> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>>
>> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A) (emphases added). Payne contends (1), relying on United States v. Williams, 558 F.3d 166 (2d Cir.) ("Williams"), petition for cert. filed, No. 09-466, 78 U.S.L.W. 3254 (U.S. Oct. 20, 2009), that this section's provisions for mandatory minimum sentences were not applicable to him because he was subject to a "greater minimum sentence," and (2) that subsection (iii) could not be applied because there was no finding, by the jury or by the sentencing court--and no evidence-- that he had discharged a firearm within the five-year statute-of-limitations period. We find no basis for reversal.

1. The Contention that § 924(c)(1)(A) Was Not Applicable

Payne did not argue in the district court that § 924(c)(1)(A) was not applicable on the ground that other provisions subjected him to a longer minimum sentence. Accordingly, this contention is reviewable only for plain error. See Fed. R. Crim. P. 52(b). A plain error is an "error" that is "plain" and that prejudicially affected the defendant's "substantial rights" and "seriously affect[ed] the fairness,

integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732 (1993) (internal quotation marks omitted). Payne does not meet this standard.

Our decision in Williams, on which Payne relies, was preceded by United States v. Whitley, 529 F.3d 150 (2d Cir.), reh'g denied, 540 F.3d 87 (2d Cir. 2008), in which we closely examined the literal language of § 924(c)(1)(A) as it affected a defendant who had been sentenced to both the 15-year mandatory minimum prison term provided by 18 U.S.C. § 924(e) for armed career criminals and the 10-year mandatory minimum sentence provided by § 924(c)(1)(A)(iii) for a defendant who discharged a weapon during and in relation to a crime of violence. We ruled that § 924(c)(1)(A)'s "except clause," i.e., "[e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law," should be applied in accordance with its terms. See Whitley, 529 F.3d at 153, 158. Since § 924(e) provided a longer mandatory minimum prison term than § 924(c)(1)(A), we concluded that the defendant was exempt from the latter, and that the imposition of the § 924(c)(1)(A)(iii) sentence constituted plain error. See 529 F.3d at 158; id. at 152 n.1.

In Williams, 558 F.3d 166, the defendant was convicted of drug trafficking in violation of 21 U.S.C. § 841(b)(1)(A), for which he was sentenced to a mandatory minimum of 10 years' imprisonment; and he was convicted of possession of a firearm in furtherance of that crime, for which he was sentenced to the

mandatory minimum five-year prison term provided by 18 U.S.C. § 924(c)(1)(A)(i), consecutive to his 10-year sentence on that underlying narcotics count. The government argued, inter alia, that the rule announced in Whitley should be limited to cases in which the "greater minimum sentence," impeding application of § 924(c)(1)(A)'s mandatory minimums, was a punishment for a firearms offense. We rejected that argument. Although stating that "we do not hold that the 'except' clause is unbounded," we held that "the 'except' clause includes minimum sentences for predicate statutory offenses arising from the same criminal transaction or operative set of facts." 558 F.3d at 170-71. Thus, we concluded that, in light of the greater mandatory minimum provided for the predicate drug offense, 10 years, the imposition of a mandatory minimum term of five years' imprisonment pursuant to § 924(c)(1)(A)(i) constituted plain error.

The boundary suggested in Williams was applied in our subsequent decision in United States v. Parker, 577 F.3d 143 (2d Cir. 2009). The defendant in Parker was convicted on several narcotics counts, including one that charged him with trafficking in a "detectable amount" of crack in July 2002 in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count II), and one that charged him with trafficking in five grams or more of crack in April-May 2002 in violation of § 841(a)(1), a quantity that subjected him, because he had a prior drug felony conviction, to a mandatory minimum sentence of 10 years, see 21 U.S.C. § 841(b)(1)(B) (Count V). He was also convicted on two firearms

- 38 -

counts, on one of which (Count I) he was given a mandatory minimum sentence of five years' imprisonment pursuant to 18 U.S.C. § 924(c)(1)(A)(i). We pointed out that one element of a § 924(c) offense is an underlying crime of violence or drug trafficking crime during and in relation to which the firearm was used or carried, and that the underlying crime specified in Count I of the indictment was the July 2002 distribution alleged in Count II. We noted that the Count II "§ 841(b)(1)(C) offense . . . , in contrast to the § 841(b)(1)(A) predicate in Williams, 'provides for no mandatory minimum' sentence." 577 F.3d at 146 (quoting United States v. Pressley, 469 F.3d 63, 64 (2d Cir. 2006), cert. denied, 549 U.S. 1297 (2007) (emphasis in Parker)). Accordingly, "Parker's predicate drug-trafficking crime provide[d] for no 'greater minimum sentence,' 18 U.S.C. § 924(c)(1)(A), than that mandated by § 924(c)(1)(A)(i)." Parker, 577 F.3d at 146.

Although a different count of the indictment in Parker, Count V, alleged a drug offense in April-May 2002 that did carry a mandatory minimum sentence of 10 years, the Count V offense was not alleged to be a predicate offense for the § 924(c) firearms offense. We stated that "[a]s Williams observed, the 'except' clause is not unbounded," and we held that "it applie[d] only to 'minimum sentences for predicate statutory offenses arising from the same criminal transaction or operative set of facts.'" Parker, 577 F.3d at 147 (quoting Williams, 558 F.3d at 171 (emphasis in Parker)). We concluded that because the indictment did not allege, and the jury did not find, that the weapon Parker

- 39 -

possessed was carried in furtherance of the April-May offense alleged in Count V,

> the district court's statutory obligation under 21 U.S.C. § 841(b)(1)(B) to sentence Parker to a minimum 120-month prison term on Count V did not relieve it of its statutory obligation under 18 U.S.C. § 924(c)(1)(A)(i) to sentence Parker to a consecutive 60-month prison term on Count I for the drug offense detailed in Count II.

577 F.3d at 147.

In the present case, count twelve of the indictment charged Payne with using and carrying a firearm during and in relation to the drug offenses charged in counts ten and eleven, to wit, conspiracy to distribute, and distribution of, cocaine. The jury, after being instructed that it could not convict Payne of the firearms offense unless it first found him guilty on one or both of those drug counts, found him guilty on both drug counts and on the firearms count. As the drug trafficking crimes in the count ten and count eleven predicate offenses for Payne's § 924(c)(1)(A) conviction carried mandatory minimum prison terms of 10 years, and the mandatory minimum prison term imposed on Payne on the firearms count pursuant to § 924(c)(1)(A)(iii) was 10 years, the mandatory minimums provided for the drug offenses were the same as, not greater than, the 10-year firearms sentence. Accordingly, the "except clause" of § 924(c)(1)(A) was not triggered by the mandatory minimums provided for Payne's narcotics offenses.

Payne argues, however, that by reason of his convictions on the murder-in-aid-of-racketeering counts he was subject to

- 40 -

mandatory minimum prison terms greater than the 10 years to which he was sentenced under § 924(c)(1)(A) because "18 U.S.C. § 1959(a)(1) carries a mandatory minimum sentence of life in prison," United States v. James, 239 F.3d 120, 127 (2d Cir. 2000) ("James"), cert. denied, 532 U.S. 1000 (2001). Under the principle established in Parker, however, § 924(c)(1)(A)'s "except clause" does not encompass those counts in this case because murder in aid of racketeering was neither alleged nor found to be a predicate offense for Payne's firearms offense.

Accordingly, we see no error, plain or otherwise, in the district court's imposition on Payne of a mandatory consecutive prison term pursuant to § 924(c)(1)(A). And were we to find error, we would be bound to conclude that the plain-error test is not met: Given that the firearms sentence is not to begin until Payne has completed his life, the 10-year sentence does not affect his substantial rights.

2.   The Contentions that the § 924(c)(1)(A)(iii) Sentence Was Improper Because It Was Unsupported by Findings or Evidence

Payne also contends that he could not properly be sentenced to the 10-year term of imprisonment provided by subsection (iii) of § 924(c)(1)(A)--rather than the five-year term provided by subsection (i)--because (a) there was no finding by the jury, or even by the court, that he discharged a firearm within the five-year statute-of-limitations period, and (b) there

- 41 -

was no evidence that could support such a finding. These contentions have no merit.

Payne's contention that he could not be punished under subsection (iii) unless a finding of discharge was made by the jury, a contention he advanced in the district court, is foreclosed by the Supreme Court's decision in Harris v. United States, 536 U.S. 545 (2002). Harris held that "§ 924(c)(1)(A) defines a single offense" and that "brandishing and discharging [are] sentencing factors to be found by the judge, not offense elements to be found by the jury," 536 U.S. at 556 (emphasis added). Although Payne contends that the holding of Harris is no longer viable in light of United States v. Booker, 543 U.S. 220, 244 (2005), this Court has rejected such contentions and has continued to follow Harris, see, e.g., United States v. Gomez, 580 F.3d 94, 104 (2d Cir. 2009); United States v. Johnson, 507 F.3d 793, 798 n.6 (2d Cir. 2007), cert. denied, 128 S. Ct. 1750 (2008).

Payne's contention that the imposition of sentence on him pursuant to § 924(c)(1)(A)(iii) was error because even the sentencing judge failed to make a finding of discharge--a contention not raised in the district court--does not meet the test for plain error. Having presided over the trial, and having listened at the sentencing hearing to the government's description--without contradiction by Payne--of Payne as "the shooter" in the Clemons murder, "sh[ooting] Mr. Clemens [from] 3 feet, 4 feet away . . . in the back of a livery cab" (Sentencing Transcript, February 1, 2008 ("S.Tr."), at 14), the court stated

- 42 -

that Payne's murders "couldn't get more brutal, more cold-blooded" (id. at 16). We conclude that the court implicitly found that Payne had discharged his firearm.

Finally, Payne contends that he could not be sentenced on the basis that he discharged a firearm because, although the jury found that he had used or carried a firearm within the five-year statute-of-limitations period, the only evidence of his shooting concerned events prior to that period. Given the nature of Payne's firearms offense, we reject this contention.

Conspiracy is a continuing offense. See, e.g., United States v. Kissel, 218 U.S. 601, 607 (1910); Eppolito, 543 F.3d at 47. A continuing offense is, in general, one that involves a prolonged course of conduct; its commission is not complete until the conduct has run its course. See, e.g., Toussie v. United States, 397 U.S. 112, 115, 120-21 (1970). When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a continuing offense, the § 924(c)(1) crime itself is a continuing offense. See, e.g., United States v. Cuervo, 354 F.3d 969, 992 (8th Cir. 2004), vacated on other grounds sub nom. Norman v. United States, 543 U.S. 1099 (2005); cf. United States v. Rodriguez-Moreno, 526 U.S. 275, 281 (1999) (holding that § 924(c)(1) constitutes a continuing offense for purposes of venue where the predicate offense is a continuing offense: "In our view, § 924(c)(1) does not define a 'point-in-time' offense when a firearm is used during and in relation to a continuing crime of violence.").

Because the narcotics distribution conspiracy that was a predicate of Payne's firearms offense was a continuing crime, Payne's firearms offense was likewise a continuing offense, rather than a "point-in-time" offense. And because, as discussed above, "brandishing and discharging [are] sentencing factors to be found by the judge, not offense elements to be found by the jury," Harris, 536 U.S. at 556, the district court could properly consider, in determining Payne's appropriate sentence, whether Payne discharged a firearm at any point during the continuation of his § 924(c)(1)(A) offense. See also United States v. Silkowski, 32 F.3d 682, 688 (2d Cir. 1994) (a district court may properly rely on acts performed outside the five-year statute-of-limitations period as "relevant conduct" in calculating the defendant's term of imprisonment under the Guidelines).

## B.   Other Sentencing Contentions

Payne also makes a number of general sentencing challenges, all of which we find meritless. None of them requires extended discussion.

Payne contends that the district court abused its discretion in denying his request for an adjournment of his sentencing hearing in order to present "factors in mitigation of sentencing." (Payne brief on appeal at 63.) This contention provides no basis for reversal. In support of the request for "an adjournment for an extended period" (S.Tr. 2), Payne's principal trial counsel stated that he was not prepared to present

- 44 -

mitigating factors because he had assumed, based on this Court's holding in James, 239 F.3d 120, that sentences of life imprisonment for Payne's convictions on the murder-in-aid-of-racketeering counts were mandatory, that he believed James to be wrongly decided, and that he wished an adjournment in order to prepare mitigating factors in case either the district court or the court of appeals concluded, contrary to James, that the district court did have discretion to impose a prison term of less than life (see S.Tr. 2-6, 13; id. at 5 ("if in fact your Honor has a discretion, then I would hope the Second Circuit on appeal will determine that the case should be remanded for resentencing")). We see no abuse of discretion in the district court's denial of this adjournment request, which, in any event, has become moot, as the contention that James was wrongly decided has not been pursued on this appeal.

Payne also contends that the district court "failed to calculate Payne's Guidelines sentence . . . and appeared to treat Payne's guideline sentence as mandatory as opposed to advisory." (Payne brief on appeal at 63.) Neither of these apparently inconsistent contentions is supported by the record. "A district court satisfies its obligation to make the requisite specific factual findings when it explicitly adopts the factual findings set forth in the presentence report. . . . It may do so either at the sentencing hearing or in the written judgment it files later." United States v. Molina, 356 F.3d 269, 275-76 (2d Cir. 2004). Here, the sentencing ranges recommended by the Guidelines were

computed in the presentence report on Payne ("PSR") prepared by the United States Probation Department; the district judge filed with the judgment a STATEMENT OF REASONS in which he expressly stated that he adopted the PSR. Further, the record of the sentencing hearing itself suggests that the court was adopting the PSR, as the court indicated that the "probation report" would be amended to reflect the fact that, subsequent to the preparation of the PSR, three counts of conviction had been dismissed pursuant to Payne's Rule 29 motion (see S.Tr. 15-16). The record at sentencing also indicates that the court considered the Guidelines. For example, a discussion of whether Payne was responsible for more than 4.5 kilograms of crack (see id. at 6-7, 14) plainly concerned Payne's Guidelines offense level, see Guidelines § 2D1.1(c)(1) (prescribing the highest offense level for a defendant responsible for "4.5 KG or more of Cocaine Base"). And the court discussed Payne's objection to an obstruction-of-justice "enhancement" (S.Tr. 9) and "adjustment" (id. at 10)-- clearly Guidelines terms. As to the nature of the Guidelines, the PSR, which the district court adopted in its STATEMENT OF REASONS, cited Booker and stated that although the Guidelines must be consulted, they are advisory. At the hearing, Payne's attorney himself spoke in terms of "the advisory guidelines" (S.Tr. 6), and nothing in the sentencing transcript--or anything else in the record--indicates that the court viewed the Guidelines as anything other than advisory.

With regard to the Guidelines calculation of the amount of crack cocaine for which Payne was responsible, the district court stated, "I . . . find that 4.5 kilograms of crack cocaine is a gross understatement of the amount involved in this offense." (Id. at 6-7.) Payne contends that this finding constitutes a procedural error because the court did not calculate the amount of crack cocaine "attributable to Payne, as opposed to the conspiracy in general" (Payne brief on appeal at 64). We disagree. Payne was accountable for "all reasonably foreseeable quantities" of crack distributed by the conspiracy of which he was a member, see, e.g., United States v. Chavez, 549 F.3d at 136; Guidelines § 1B1.3 Application Note 2. According to the evidence at trial, on which the district court expressly relied (see S.Tr. 7)--and the verdict of the jury which found Payne guilty after it was instructed that in order to do so it must find that he was a member of the single conspiracy alleged in the indictment--Payne was a member of the conspiracy at least during the period beginning in 1995 and continuing well into the 2000s. But even considering only the one-year period during which Payne served as Thomas's lieutenant, the district court's finding was unimpeachable. Thomas testified that as his lieutenant, Payne, inter alia, packaged the crack and delivered the packages to sellers "[f]or about a year or so" (Tr. 1322); that they were selling seven days a week (see id. at 1320); and that sales averaged 62 to 125 grams of crack a day (see id.). Thus, considering just the one year when Payne was directly managing crack sales for Thomas, and assuming the low end

- 47 -

of Thomas's estimate as to the quantities sold, Payne was responsible for the distribution of more than 22.6 kilograms of crack.

Finally, we reject Payne's contentions that his sentence was procedurally flawed on the ground that the court "failed to . . . consider 3553(a) factors" (Payne brief on appeal at 63) and "failed to adequately explain the sentence it imposed on Counts One, Two, Ten and Eleven," i.e., the RICO and narcotics counts (id. at 65).

> In determining whether the district court has considered the appropriate factors, we do not require "robotic incantations" by the sentencing judge. United States v. Brown, 514 F.3d 256, 270 (2d Cir. 2008); United States v. Fernandez, 443 F.3d 19, 30 (2d Cir.), cert. denied, 549 U.S. 882 . . . (2006); [United States v.] Crosby, 397 F.3d [103,] 113 [(2d Cir. 2005)]. In the absence of record evidence suggesting otherwise, we presume that the district court has faithfully discharged its duty to consider the § 3553(a) factors. See, e.g., United States v. Brown, 514 F.3d at 264; United States v. Fernandez, 443 F.3d at 30.

United States v. Carr, 557 F.3d 93, 107 (2d Cir.), cert. denied, 130 S. Ct. 169 (2009); see, e.g., United States v. Fleming, 397 F.3d 95, 100 (2d Cir. 2005) ("As long as the judge is aware of both the statutory requirements and the sentencing range or ranges that are arguably applicable, and nothing in the record indicates misunderstanding about such materials or misperception about their relevance, we will accept that the requisite consideration has occurred."). In the present case, the district court's explanation at sentencing, though sketchy, reflects explicit consideration of such § 3553(a) factors as "the nature and

circumstances of the offense," 18 U.S.C. § 3553(a)(1), "the need for the sentence imposed . . . to reflect the seriousness of the offense," id. § 3553(a)(2)(A), "the kinds of sentences available," id. § 3553(a)(3), and the sentencing court's duty to impose a sentence "sufficient, but not greater than necessary" to serve the § 3553(a)(2) purposes of sentencing, id. § 3553(a). The court stated:

> I believed the evidence just like the jury did and this series of crimes couldn't get more serious, couldn't get more brutal, more cold-blooded, couldn't get more damaging to the community, all the drug trafficking and the murders.
>
> There is no appropriate sentence for you, sir, but life in prison. An argument can be made that this maximum sentence falls short of the need to reflect the seriousness of your crimes, but it is the maximum sentence.

(S.Tr. 16.) We see no indication that the district court did not consider all of the requisite § 3553(a) factors; and it plainly explained why it sentenced Payne to imprisonment for life.

CONCLUSION

We have considered all of Payne's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.